parcels plaintiffs may claim. There has been proved no contract to this effect. In the absence of proof of the creation of the right to operate the entire tract of 75 acres in accordance with the requirements of section 259 of the Real Property Law, the finding must be that the plaintiffs are not the owners of the oil wells drilled by the defendants, and are not entitled to possess the entire 75 acres and to restrain defendants from operating thereon.

[3] While the statute of limitations has run against the claim for a specific performance of an alleged contract to lease, founded upon the paper of September 21, 1889, and all the facts and circumstances established, yet it can equitably and reasonably be held that the plaintiffs should be permitted to continue the operation of the four oil wells drilled by them, retain what oil they will produce, less one-eighth thereof as royalty to the defendants, exclusively possessing for such purpose all the land within a radius of 200 feet from each well; that such operation of such oil wells continue by plaintiffs as long as oil is produced in paying quantities, and be limited to the four oil wells already drilled; that upon abandonment of such oil operations the plaintiffs be permitted to remove their fixtures and appurtenances, and for the purpose of such operation and removal plaintiffs have ingress to and egress from said premises. The plaintiffs having drilled these four wells, their ownership of the same and the right to operate having been acquiesced in by the owner of the fee for more than 25 years, their acts must be deemed to have been in performance of some contract therefor, and their possession thereof will not be disturbed.

[4] The plaintiffs failing to establish title to the right to exclusively operate any of the 250-acre tract in the possession of the defendants, and failing in their claim to the ownership of the oil wells drilled by the defendants, would be subject to costs of this action, were it not for the fact that the defendants in their answer denied plaintiffs' right to the four wells and demanded judgment that the defendants' rights in all the lands in controversy were superior to those of the plaintiffs. Neither party succeeding upon the issues raised by the pleadings, costs are not awarded.

The complaint will be dismissed as against defendant Forman, without costs.        ⊛

---

GILL v. JAMAICA BAY MFG. CO. et al.

(Supreme Court, Appellate Division, Second Department. January 14, 1916.)

1. FRAUD ⬥⟹11—ACTIONS—MATTER OF OPINION.
    Statements as to matters of opinion, which subsequently prove false, furnish no basis for actionable fraud.
    [Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 12, 13; Dec. Dig. ⬥⟹11.]

2. WITNESSES ⬥⟹183½, New, vol. 9 Key-No. Series—TESTIMONY OF STATEMENT OF DECEDENT—EFFECT..
    In an action against a corporation to cancel an agreement whereby bonds of plaintiff were loaned to defendant, on the ground that the loan

⬥⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was procured through fraud, testimony by plaintiff, her husband, and son as to misrepresentations made by a corporate agent concerning the transaction *held* not to warrant judgment against the corporation, under the rule that testimony as to statements made by a person now dead must be received with caution; the agent having died before suit.

3. CORPORATIONS ⊛189—ACTIONS—EVIDENCE—SUFFICIENCY.

In such action, evidence *held* insufficient to show the fraud.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 706–722; Dec. Dig. ⊛189.]

4. PRINCIPAL AND AGENT ⊛137—ESTOPPEL TO DENY AUTHORITY OF AGENT.

Where plaintiff, who claimed that the corporate defendant induced her by fraud to loan to it bonds, did not, on making demand on the corporation for return of the bonds, assert that her agent was without authority to consent to the loan, she is estopped to set up the agent's want of authority in a suit several years later.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 492–494; Dec. Dig. ⊛137.]

5. PRINCIPAL AND AGENT ⊛116—AUTHORITY OF AGENT—SECRET INSTRUCTIONS.

Where plaintiff delivered to her agent possession of bonds, and gave no notice that his authority was limited, secret instructions to the agent are not binding on third persons.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 377, 377½; Dec. Dig. ⊛116.]

Appeal from Trial Term, Queens County.

Action by Carrie Gill against the Jamaica Bay Manufacturing Company and others. From a judgment for plaintiff, and from the judgment as resettled, the defendant Manufacturing Company appeals, while the defendants Swain and Chamberlin appeal from the judgment in so far as it failed to direct a dismissal of the complaint as to them. Judgment reversed and remanded.

Argued before JENKS, P. J., and THOMAS, CARR, MILLS, and RICH, JJ.

William S. Maddox, of New York City, for appellants.
Jacob S. Rosenthal, of New York City, for respondent.

JENKS, P. J. This judgment represents the value of certain coupon bonds payable to bearer, issued by the defendant corporation. These bonds are part of a number of bonds lent to that corporation under an agreement executed by several bondholders (who were also stockholders) with the corporation. The plaintiff's husband, T. Gill, was a party to the agreement. The plaintiff complains, on the equity side of the court, that she was induced to deliver the bonds by the fraudulent representations of Stillings, the secretary of the defendant corporation, and that the failure to return the bonds or their equivalent was attributable to the collusion and fraud of the corporation in concert with the other defendants. The defendants pleaded the general issue. The referee decided that the said agreement was secured by fraud, that the plaintiff did not ratify the agreement, that it should be canceled and annulled, that the personal defendants had combined through their control of the defendant corporation to prevent pay-

ments of the proceeds of the bonds to the plaintiff, and that there was due to her $5,000 from the corporation. Thereupon a money judgment only, and against the corporation only, was entered. The defendants appeal.

Thomas Gill, the husband of the plaintiff and a stockholder in the corporation, attended a meeting on October 26, 1909, at the office of Stillings. There were present Stillings, Corey, Swain, and Chamberlin, all bondholders. An agreement prepared by the counsel for the defendant corporation was presented, and the various persons present, including Thomas Gill, signed it. Thomas Gill testifies that before signing it he inquired of Stillings, "What is this all about, Bill?" and Stillings answered, "It is just as I told you, Tom; I am signing the same thing myself," whereon Gill, without reading the paper, signed it, together with the others present. The agreement is as follows:

"Memorandum of Agreement made October 26, 1909, between the Jamaica Bay Manufacturing Company, a corporation organized under the laws of the state of New York (hereinafter called the company) and the several holders of the bonds of the said corporation who shall lend the same to the company pursuant to this agreement and who are hereinafter called the bondholders.

"The company is in need of additional capital to be used in the enlargement of its plant, the purchase of new machinery, and the payment of existing debts. It is considered by the bondholders that it is not wise to increase the stock capitalization of the company. Each of the bondholders who becomes a party hereto is the owner of capital stock in the company equal to or exceeding in value the amount of bonds held by him. For the purpose of raising money for the company, so as to enlarge its business and thus increase the chances of added value to the stock, each of the bondholders who executes this agreement is willing to lend the company certain of his bonds, without interest, as hereinafter set forth.

"Now, in consideration of the premises and of the sum of $1 by each party hereto to the other in hand paid, it is agreed:

"(1) Each of the bondholders signing this agreement agrees to lend, and does simultaneously with the execution hereof lend, to the company the number of its corporate bonds now held by him which is set opposite his signature hereto.

"(2) It is understood and agreed that the company shall have the right to pledge the said bonds so lent to it as security for the loan of money or as security for the payment of any debt incurred or the performance of any contract made by it; and the company has the further right, if in the judgment of the board of directors it is in the company's interest to do so, to sell any of the bonds so lent to it at such price as the board of directors shall deem adequate.

"(3) The said loan of bonds is for an indefinite term, and the company agrees to return the same to the bondholders, lending them only when and as the board of directors by a majority vote shall determine that the financial situation of the company is such that it may safely and prudently return the bonds or some part thereof, or repay the value as hereinafter provided.

"(4) The loan of bonds being without interest, the bondholders hereby waive the payment of all coupons attached to the bonds maturing during the time of the loan.

"(5) The company may at any time before the return of the bonds and upon the vote of a majority of the board of directors pay to any bondholder, party to this agreement, the value of the bonds or any part of them lent by him at par, which payment shall be accepted as full value for the bonds and as a satisfaction and discharge of the loan to the extent of the bonds so paid for.

"(6) This agreement binds and benefits the parties, their representatives, and assigns."

The alleged fraud and deceit of Stillings is that Stillings theretofore had told Gill and his wife, this plaintiff, that the bonds, if lent, would be returned to the lender within a year or a year and a half, which was in contradiction of the third clause of the said agreement. In other words, when Stillings said at the meeting, "It is just as I told you," he thereby intended that Gill should believe that the agreement provided that the bonds would be returned within one year or one year and a half.

Of course, so far as the fraud in procuring the bonds under this agreement is concerned, it depends primarily both upon proof that Stillings said these words or their equivalent, articulated with proof that Stillings had theretofore stated that the bonds, if lent, would be returned in a year or in a year and a half. I put aside the questions of the authority of Stillings to represent the corporation if he made such statements, and as to the finality and exclusiveness of the written agreement.

The agreement was executed and the bonds were lent both in October, 1909. Consequently the "year" expired in October, 1910, and the "year and a half" in April, 1911. The plaintiff and her husband, Thomas Gill, testify that at the end of the year, and all within a year, they made several demands for the bonds, both upon Stillings and the defendants, all in vain, and that she and her husband were put off by pleas for patience and by statements that the corporation was not in a financial condition to respond.

Stillings died in July, 1911, or six or seven months after these alleged demands. This action was not begun until July, 1914, three years after Stillings' death.

[1, 2] The plaintiff would establish that Stillings made these prior statements solely by her testimony, that of her husband, and that of her son. Thus the plaintiff, interested in the event, and her witnesses, who are naturally biased, control the evidence, for Stillings is dead. Proof by oral statements of one's adversary is in its nature comparatively unsatisfactory. And the proof in this case is of oral statements of him who is dead. In Lea v. Polk County Copper Co., 21 How. 504, 16 L. Ed. 203, the court say:

"And courts of justice lend a very unwilling ear to statements of what dead men had said."

In Piffet's Succession, 37 La. Ann. 871–873, it is said:

"The narration of conversations correctly is the most difficult feat of memory and of expression, and of all evidence the narration of a witness of his conversation with a dead person is esteemed in justice the weakest."

See, too, Lehigh Coal & Navigation Co. v. Central R. R. Co., 41 N. J. Eq. 167, 3 Atl. 134; Crouch v. Hooper, 16 Beavan, 182–186. The reason is not far to seek. The witness has no fear of direct contradiction by the other party to the conversation, and as against him there is no chance of explanation. Nothing can be said by the other party that recalls to the witness the circumstances which attended the statements, and there is no opportunity to check exaggeration, or to suggest the exact statements by way of correction. The rule enunciated in

Rosseau v. Rouss, 180 N. Y. 116, 72 N. E. 916, and like cases, is made for the reason that such contracts are easily fabricated and "hard to disprove, because the sole contracting party on one side is always dead." See Taylor v. Higgs, 202 N. Y. 65–69, 95 N. E. 30. Thus Woodruff, J., writing for the court in Card v. Card, 39 N. Y. 317, 319, says of the restriction of the statute which is now section 829 of the Code of Civil Procedure:

> "The restriction in question is intended to prevent the party from testifying to the personal act, declaration, or conversation of the deceased. These are matters which, if he were living, he might explain, qualify, or contradict."

As to these alleged prior statements of Stillings, it is somewhat significant that, in a complaint that pleads evidence to an unusual extent, the plaintiff complains three times that the statements were made to her husband and by him communicated to her, but never that they were made directly to her, so she saw fit to amend her complaint at trial to conform to her proof. The plaintiff testifies that the statement was made first to her at a Yacht Club house in 1909, when, after some conversation, she said to Stillings, "If I would loan you the bonds, when would I get them back?" and Stillings answered, "Why, Mrs. Gill, in a year or a year and a half sure, without interest;" that a week after, at her house, Stillings said "that if I loaned him the bonds he would return them in a year or in a year and a half without interest." Although Thomas Gill, on his direct examination, testifies to the conversation at the clubhouse, he but says that Stillings then said "the company was perfectly solvent, that it was only a temporary loan, that we would get the bonds back—if not the bonds, an equivalent of the bonds." But he does not testify that Stillings said that they would get back the bonds in a year or a year and a half. He also testifies that he and his son were present when Stillings came to the house, evidently the occasion referred to by the plaintiff, and although the witness was asked to tell everything, he does not mention the statement as to the return of the bonds in a year or a year and a half. But, further on, after he had been asked the direct question whether any representations were made or conversation had with him and the plaintiff as to whether the bonds were to be kept absolutely or to be returned, he answers, "Why they were to be returned within a year or a year and a half," and that this was said to him "five different times, before I delivered the bonds." Upon his redirect examination he was asked:

> "When Stillings came to your home, and when you saw Stillings at the Jamaica Bay Club, as you have testified in chief, in the presence of your wife, did Stillings make any other representations that the bonds would be returned within a year or a year and a half? A. He said we were to get the bonds back, or an equivalent to the bonds, at that time."

Plaintiff's son, when testifying, was within 3 months of 19 years of age. He testifies to interviews in the summer of 1909, when he was about 13 years old. He recalls the interview at the Yacht Club between Stillings and his mother, and upon the requirement to give Stillings' words as well as he can, he testifies:

"Mr. Stillings said to my mother, Mr. Stillings asked my mother—won't that do—to loan him bonds, for the company needed some capital to make some repairs and to enlarge the plant, and he represented that these bonds would be given back, or their money value, within a year or 18 months at the most, and the company was very solvent. Q. That the company was what? A. The company was solvent; they had a standing capital.

"By Mr. Maddox: Q. They had a what? A. They had a capital; a surplus; a surplus.

"By Mr. Maddox: Q. A standing capital and surplus, you say? A. Yes. And they had a surplus of money, and they only needed this money for the enlargement of the plant, and he thought that the idea of loaning the bonds was very good, as he was loaning some bonds himself, as were other bond-holders."

He was also present at another interview, and testified that Stillings said:

"He wished to get the bonds, to get the loan of the bonds from my mother, and he said, he repeated, that the bonds would be repaid within a year. He made that very emphatic."

He was also present at other interviews, but at none where Stillings is alleged to have made the representations. It is hard—I do not say incredible—to credit that a witness, in recalling a conversation held at a casual meeting between other persons, heard by him as a lad of 13, can testify that he then heard and has ever held fast in his memory until six years afterwards such expressions. We need not conclude nor think that these witnesses are guilty of deliberate lying. The importance of this proof seems to be fully understood by the witnesses. Thus, when Thomas Gill was asked by the referee, "Was there any talk between you at all at the time she gave you the bonds to be given up?" the witness answered, "Yes; she said, 'We'll get the bonds back in a year and a half, and you might as well let them have them for that length of time;" and again, when plaintiff was asked:

"Did you give your husband any instructions, when you gave him the bonds, what to do with them? A. Yes, sir; he must promise to have Mr. Stillings to promise that I will get them back in a year or a year and a half."

This constant reiteration might seem suspicious, and not to the hypercritical alone. And if the witnesses are correct, Stillings' statements were made in series. It is possible, nay probable, that the length of the proposed loan was discussed. The Gills and Stillings were alike interested in this going concern. They appear to have been on friendly, if not intimate, terms. These witnesses do not pretend to say that Stillings said that there would be a fixed time for the return of the bonds, but only that they would be returned in a year or a year and a half. They do not pretend to say that Stillings said that this term would be stated in any agreement. According to them, Stillings' statement was indefinite. The parties knew that the purpose of the loan was to further the business of the corporation. Success and the measure of success were of the future. Stillings naturally could not state exactly when the bonds could be returned. On the other hand, it was natural that he should express his opinion—his forecast. But a mere matter of opinion, isolated and stated as such, is not a basis for actionable fraud. Hickey v. Morrell, 102 N. Y. 454, 463, 7 N. E. 321, 55

Am. Rep. 824. But it would be natural for an interested or a biased witness, convinced of the justice of a claim to regain the plaintiff's own property, to convince himself that what was merely an opinion was a positive representation, and thus to strip the expression of any features of judgment or of belief, and to leave it as a positive assertion whereby the plaintiff was defrauded of her own. See Crouch v. Hooper, 16 Beavan, 182–186. I think that the probative force of such testimony is not sufficient.

[3] But it must be remembered that, if I am wrong in this thought, the case, so far as fraud is concerned, depends also upon the proof that Stillings made the declaration "It is just as I told you" to Thomas Gill at the meeting of the bondholders. Of course, the dead man, Stillings, cannot be heard in contradiction or in explanation, and to this extent Thomas Gill controls the evidence. But the meeting, as I have said, was attended also by Corey, Chamberlin, and Swain. Chamberlin testifies that all were asked to sign the agreement, and none asked for any explanation. Swain testifies that there was no discussion that he remembers, and that he did not remember of hearing Thomas Gill ask any questions of Stillings. Corey, called by the plaintiff, was formerly the president, but was not then interested in the corporation. He was not asked by plaintiff whether there was any conversation between Thomas Gill and Stillings, but upon cross-examination he was asked and answered as follows:

"Q. Did you hear Mr. Gill ask for any meaning of the signature to the paper on that occasion? A. I only remember Mr. Gill saying that, if I didn't put up my bonds, the rest wouldn't."

The agreement which Thomas Gill signed was in plain contradiction of what the Gills say that Stillings had said to them as to the return of the bonds. It was laid before Gill at the time, and after he signed it a copy thereof was given to him, which he took away. Chamberlin testifies that he delivered a copy of this agreement to Gill in his shop, left it with him after explaining the purpose of the scheme, about October 23d or 24th; that it was thereafter, on October 26th, that the said meeting was held; that he did not receive the bonds from Gill until October 28th, when he called upon Gill to obtain them; and that the receipt was signed by him as of that date. Yet I understand Gill to testify that he was handed the receipt on October 26th. If Stillings intended to work a fraud by such prior statements, that could be done only by procuring Thomas Gill's assent to the formal agreement without a reading of it. Stillings certainly took extreme chances, for he left in the possession of Gill the agreement as plain evidence of his fraud, for Gill or the plaintiff to read during the two days that intervened the execution of the agreement and Gill's delivery of the bonds thereunder. Stillings had no reason to believe that at no time thereafter would the Gills read the agreement. But the Gills testify that they knew nothing of its contents until after they had handed it over to the attorney or counsel for the plaintiff in this action. Thomas Gill was not called to contradict the evidence adduced by the defendants. I think that proof that Stillings made such statement is not sufficient evidence thereof.

[4, 5] The fraud, then, is out of the case. The finding that the plaintiff in no way ratified the agreement, and that therefore it should be canceled and annulled, is not justified. Even conceding that the plaintiff, and not Thomas Gill, was the owner of the bonds payable to bearer, and the testimony is not plain that she was such owner, it is undisputed that her husband attended the meeting, signed the agreement, and thereafter delivered the bonds pursuant to it. Thus it appears that plaintiff clothed Thomas Gill with entire authority in the premises, and that he acted thereunder to the completion of the transaction. The plaintiff by her own testimony did not, after the lapse of the year, demand the bonds upon the theory that her husband had no authority to sign the agreement or to deliver the bonds, but that she understood that the time for the loan had expired. I think, therefore, that she is estopped. Bank of Batavia v. N. Y., L. E. & W. R. R. Co., 106 N. Y. 195–199, 12 N. E. 433, 60 Am. Rep. 440; People v. Bank of North America, 75 N. Y. 547–562. Even if Thomas Gill was but her special agent, yet he appeared as clothed with full authority to sign the agreement and to deliver the bonds thereunder. And so far as the defendants are concerned his powers were not limited by instructions uncommunicated to the other parties to the agreement. Lowenstein v. Lombard, Ayres & Co., 164 N. Y. 324, 58 N. E. 44; Cox v. Albany Brewing Co., 56 Hun, 489, 10 N. Y. Supp. 213.

The judgment is reversed, and a new trial is granted; costs to abide the final award of costs. All concur.