## ROSENTHAL v. CELANESE CORPORATION OF AMERICA.

District Court, S. D. New York.

Feb. 25, 1942.

Bondy & Schloss, of New York City (N. P. S. Schloss and Norman Winer, both of New York City, of counsel) for plaintiff.

Cooper, Kerr & Dunham, of New York City (Drury W. Cooper and John N. Cooper, both of New York City, of counsel), for defendant.

COXE, District Judge.

This is a suit for alleged wrongful appropriation by the defendant of an original idea for making artificial silk yarn, irregular in thickness, for use in the manufacture of fabrics simulating shantung or pongee silk.

The complaint alleges that the idea was conceived by the plaintiff prior to 1926; that it was disclosed to the defendant in the early part of 1926, pursuant to an oral agreement under which the defendant undertook not to use the idea commercially without the consent of the plaintiff; and that the defendant, without the plaintiff's consent, has, since about the middle of 1936, used the idea commercially in the manufacture and sale of artificial silk yarn of irregular thickness, and fabrics made therefrom, in violation of the agreement. The relief sought is an injunction and an accounting.

The answer denies substantially all of the material allegations of the complaint. It also sets up a number of separate defenses. In one of these defenses, it is alleged that the plaintiff obtained two United States patents, Nos. 1,617,544 and 1,620,233, embodying his ideas, and that both patents were adjudicated invalid by the District Court in Delaware in an infringement suit between the present parties, Rosenthal v. Celanese Corporation of America, 32 F. Supp. 543.

Shantung or pongee silk is made with natural silk yarn of irregular thickness. This irregularity in the yarn gives the cloth a rough or uneven appearance, which accounts in large measure for its popularity. Prior to 1925, there was no completely artificial silk cloth on the market simulating shantung or pongee silk. The plaintiff says that this was because no satisfactory method had been devised for making artificial silk yarn of irregular thickness, and that he alone was able to find a solution for the problem.

The plaintiff had been connected with the silk textile business for a number of years prior to 1925. He had, however, no experience in the production of artificial silk, and his knowledge of the way the material was made was only general and largely superficial. He testified that in 1925 he ascertained, after some research, that artificial silk yarn was ordinarily made by pumping the spinning solution through numerous openings in a "spinneret" and then winding the resulting threads on a "bobbin"; this gave him the idea that in order to obtain a yarn of irregular thickness, "the simplest thing to do would be to to vary either the speed of the pump or the speed of the take-up in order to get variations".

The plaintiff, after testing his idea on a makeshift apparatus set up in his home, went to a patent attorney and arranged

to have him file an application for a patent. The application for this patent was filed on August 27, 1925, and states that the invention "relates generally to the manufacture of ornamental fabric, and has particular reference to a method of producing such a fabric by the utilization of a composition of the nature of viscose". The stated object is to produce an ornamental fabric resembling the type of fabric made with silk thread produced from uncultivated silk worms. The specification mentions that this may be done either (1) by depositing masses of viscose of pasty consistency upon an already formed base thread, or (2) by depositing the viscose upon a finished base fabric. There was no mention in the application as originally filed that the asserted invention had anything whatever to do with varying the speed of the pump, or varying the speed of the take-up mechanism, in the process of making the yarn.

Immediately after the patent application was filed, the plaintiff took his idea to the Industrial Fiber Company, a large manufacturer in Cleveland, and tried to interest that company in taking a license under the patent. He said that he explained the idea to them in confidence, and that they made some sample yarn, which he received about December 30, 1925. The Industrial Fiber Company was not, however, interested in producing the yarn, and suggested the defendant as a likely possibility.

Shortly after December 30, 1925, the plaintiff went to the defendant and submitted his idea to Boreham, the vice-president, treasurer and officer in charge of sales of yarn of the defendant; he was unable, however, to fix the exact date of the interview, but thought it was soon after he received the sample from the Industrial Fiber Company. What transpired at this interview rests entirely on the testimony of the plaintiff; there were no others present besides the plaintiff and Boreham, and no memorandum was made of the conversation. Boreham died in 1936, prior to the commencement of the present suit, and before the plaintiff made any contention such as he now advances.

The testimony of the plaintiff regarding his first interview with Boreham is in substance as follows: He explained to Boreham that he had "something of importance and of a confidential nature to talk over", and wanted to be sure that he was talking with "a man in authority in the corporation" because he had "an idea on which I (he had) just filed an application for a patent", but had not up to that time "received any patent". After Boreham had satisfied the plaintiff of his authority to act for the defendant, the plaintiff asked whether, if the plaintiff showed Boreham "something new in the form (of) a rayon yarn", he would be willing to pay a 5 per cent. royalty on the yarn and the fabrics made from the yarn. Boreham refused to commit himself on this proposal, but stated that "if you have something which, as you say, no other rayon manufacturer is making, and which we are not making, or which we did not contemplate making, I will assure you that we won't use your idea without first making an agreement with you. We will either make an agreement with you to pay you what is a fair and reasonable royalty, or we won't use it at all." Boreham then took the plaintiff into the showroom and showed him samples of various cloths the defendant was making. The plaintiff thereupon exhibited the sample yarn made by the Industrial Fiber Company, at which Boreham "rather smiled" and said: "It is a funny thing you are trying to get us interested in this. We have done that accidentally from time to time." The plaintiff commented that "every rayon manufacturer from time to time makes thick and thin yarn accidentally", "but you cannot run a mill on accidents". He then explained that "It is done very simply. They just simply put a speed change device on the pumps, and you can do it by putting a speed change device on the take-up". At the conclusion of the interview, Boreham said "I will tell you very frankly, we have never made it, and I have never seen anything like that, and I am going to take this up with Dr. Dreyfus, and I want you to get in touch with me in a week or two".

The plaintiff also testified that a week or two after his first interview, he again saw Boreham, and was told by him that after conferring with Dr. Dreyfus, the president of the defendant, they had decided that "it is one of these things we do not care to go into". There was another interview with Boreham in May or June of the same year, at which Boreham is represented as having said that the defendant was not interested "because we are committed to making even yarn". The matter rested there until May or June, 1928, when the plaintiff again approached Boreham, and was told that he would "have to think it over", and would let the plaintiff know "if anything happens". A further in-

direct attempt to interest the defendant was made in 1929 after the two Rosenthal patents had issued, but that also met with no success.

The original patent application filed by the plaintiff on August 27, 1925, was divided in its progress through the patent office, and resulted in the issuance to the plaintiff of two patents, No. 1,617,544, for "manufacture and treatment of threads", issued February 15, 1927, and No. 1,620,233, for "process of making thread", issued March 8, 1927. The disclosure of these two patents is the same as that of the original application filed on August 27, 1925, with the single exception that the specification of patent No. 1,620,233 describes a third method of obtaining the desired result by creating an irregular or surging action of the pump forcing the spinning solution through the jets of the spinneret. This third method was not mentioned in any way in the original application, but was added by amendment on February 1, 1927, without any supplemental oath.

In 1932, the plaintiff brought suit against the defendant in the District Court in Delaware for alleged infringement of both patents. This suit was dismissed in 1938 without prejudice to the bringing of another suit. Almost contemporaneously with the dismissal, the plaintiff started a second suit against the defendant in the same Delaware court for alleged infringement of the same two patents. The second suit was tried on the merits in 1939, and resulted in a decree holding both patents invalid for anticipation and lack of invention, holding patent No. 1,620,233 invalid because it contained new matter without a supplemental oath, and holding that the defendant did not infringe either patent. There was no appeal by the plaintiff from the decision. The present suit was commenced on September 16, 1940, after the entry of the decree in favor of the defendant in the patent suit.

The defendant concedes that it has been profitably engaged in the manufacture and sale of irregular artificial silk yarn continuously since 1936, and down to the present time. The method employed in the manufacture of the yarn is well summarized in the opinion of Judge Nields in the Delaware suit (Rosenthal v. Celanese Corporation of America, D.C., 32 F.Supp. 543, 545) as follows: "A solution of cellulose acetate in acetone is extracted at a uniform rate through a spinner in a spinning cabinet through which hot air flows to evaporate the acetone. The yarn leaves the cabinet and passes through the guide in a lifter to a uniformly rotating roller. The lifter is caused to move up slowly and drop suddenly. When the lifter drops suddenly the stretching between the spinning jet and the feed roller is automatically stopped thus producing a thick undrawn place in the filaments".

It will be seen from this summary of the evidence that the plaintiff's whole case rests on his own unsupported testimony that in the early part of 1926, he, orally and in confidence, disclosed to Boreham, an officer of the defendant, that irregular artificial silk yarn could be made by varying the speed of the take-up mechanism during the spinning operation. That is all that the defendant does, and it was only in 1936, or ten years after the plaintiff says he disclosed his idea, that the defendant started to manufacture in that way. Clearly, testimony like this, concerning conversations held years before with a man now dead, is subject to the greatest scrutiny before it can be accepted. Lea v. Polk County Copper Co., 21 How. 493, 62 U.S. 493, 494, 504, 16 L.Ed. 203; Rowland v. Biesecker, C.C., 181 F. 128, 132, affirmed 2 Cir., 185 F. 515; Gill v. Jamaica Bay Manufacturing Co., 171 App. Div. 165, 157 N.Y.S. 52.

I think the evidence is insufficient to show that the plaintiff made any disclosure to Boreham with respect to varying the speed of the take-up mechanism. The plaintiff testified that he went to see Boreham after the patent application had been filed, and in the hope that he could induce the defendant to take a license. He did not have with him a copy of the patent application, but it is hard to believe that he disclosed to Boreham anything more than it contained. He himself says that he told Boreham at the outset of the interview that he had an idea on which he had just filed an application for a patent. Yet the patent application in its original form made no reference at all to varying the speed of the take-up mechanism. Even as late as 1927, when the amendment was made, there was still no mention of any such method for making irregular yarn; the only reference in the amendment was to an irregular or surging action of the pump, which is not the method employed by the defendant. I am unable, therefore, to credit the plaintiff's testimony that he told

Boreham about varying the speed of the take-up mechanism, and I find as a fact that no such disclosure was made. With this disposition, it is unnecessary to consider the other questions raised by the parties.

There may be a decree for the defendant dismissing the complaint with costs.