62 U.S. 493 (1858)
21 How. 493
WILLIAM P. LEA, APPELLANT,
v.
THE POLK COUNTY COPPER COMPANY ET AL.
Supreme Court of United States.

*494 It was argued by Mr. Campbell and Mr. Stanton for the appellant, and by Mr. Smith and Mr. Lyon for the appellees, on which side there was also a brief by Mr. Maynard.
*495 Mr. Justice CATRON delivered the opinion of the court.
There stood on the record book an entry for 80 acres, in the name of William P. Lea, No. 5,446, dated April 5, 1842.
A patent issued, founded on this entry, dated 21st August, 1842, No. 5,744.
This patent is in the name of William Park Lea. It was signed by the Governor, countersigned by the Secretary of State, and sealed with the great seal of the State.
As originally filled up, it was in the name of William P. Lea, and was altered to William Park Lea, by adding the letters "ark" to the P. This was done by the register of the land office, whose duty it was to prepare the patent for the signatures of the Governor and Secretary; and the act of affixing the great seal to it, which gave it validity as against the State, divested her title, and vested it in the grantee, on the patent thus executed being delivered to him.
William Park Lea and William Pinkney Lea wrote their names alike, William P. Lea; the latter always, and the former frequently, although he often signed his name William Park Lea. The register added the letters "ark" to the middle name, to distinguish between them, as both had entered lands in the entry taker's office, and confusion prevailed as to who was the proper owner. This is the effect of the register's evidence. In filling up grants Nos. 6,260, 6,258, and 5,764, they were made out in the name of William Park Lea; but the register scraped out the letters "ark," and issued the patents in the name of William P. Lea, because the lands had been entered by William Pinkney Lea.
No. 5,764 of these patents was filled up on the same day (21st August, 1842) that the one (No. 5,744) here in dispute was filled up, and the letters "ark" added to the letter P; the the other two (Nos. 6,260 and 6,258) were filled up December 8th, 1842. Five other patents were filled up properly in the name of William P. Lea. This was all done in the latter six months of 1842, and the grants were founded on entries made *496 in April of that year, in the Ocoee land office. The respective claimants were related to each other, and familiarly known to the register. The entries had all been made and were recorded in the name, "William P. Lea."
That this was honestly done by the register, is not open to dispute. He has given a deposition in great detail, and accounts for his course of proceeding entirely to our satisfaction, so far as his integrity is concerned.
This patent (No. 5,744) the bill seeks to have reformed so as to stand in the name of William P. Lea, the complainant, and to be used in an action of ejectment pending in the court below, by the complainant, against the respondents; and, secondly, if said grant shall be found to have been issued to the person not entitled to the land, that then the court will divest the title of the respondents, and vest it in the complainant, so that he may use the decree on the trial of his action of ejectment.
3. The bill also prays, that the court may remove impending clouds from the complainant's title by declaring all the alleged titles of the respondents, or either of them, void, and direct the possession of said lands to be surrendered to the complainant, together with a prayer for further and general relief.
To the relief sought, among other defences, (set up in their answers,) the respondents rely on the fact that they claim under one John Davis, who purchased from William Park Lea, and took title by a deed in fee with a general warranty of title for the land in dispute, and that Davis, their vendor, purchased and paid for the land to said William Park Lea, without any notice or knowledge that the complainant had any equity in the land, or set up claim thereto.
This deed is produced, dated June 18th, 1846, and appears to have been duly executed by William Park Lea, and the consideration money was paid to him by John Davis. It is not pretended that John Davis had any notice of the complainant's claim when the deed was executed; the complainant had then no knowledge himself that he had any interest in the land.
One objection to this deed is, that it was not duly proved, and could not be lawfully registered according to the laws of *497 Tennessee. In the certificate of probate of Elias Davis, one of the subscribing witnesses, the clerk does not say the witness swore that the grantor acknowledged the same on the day it bears date. The other witness so proves. Now, as the deed shows the date, and the certificate of probate says the grantor acknowledged it for the purposes therein contained, the probate is covered by the provisions of the act of 1846, (ch. 78, Nicholson's Statute Laws, 242.)
Caldwell, Keith, & Mastin, purchased from John Davis in the year 1852, paid the purchase-money, ($6,000,) and took a deed in fee simple, with a covenant of general warranty of title for the land in dispute; and they also rely on the plea that they were bona fide purchasers of the legal title, or what purported to be so; and this allegation is established by the proof, unless it be true that the letters "ark," crowded after the letter P, in William Park Lea's name, at the various places that this alteration is found in the patent, was sufficient to put the purchasers on inquiry. Now, if they had inquired of the register, he could only have told them that he put the letters there in the course of his official duty; but when, he could not say, this being what he proves here. Then the presumption comes in, that, as a public officer, the register did his duty, and he who impeaches the act as illegal must prove the allegation. On this assumption, the register filled up the patent as it is now found, before the Governor signed it, and the seal of State was attached  that is to say, when the patent bears date.
Then, again, all the incipient steps authorizing the register to issue the grant, the Governor to sign it, and the Secretary to attach the great seal, are presumed as having been regular; nor was the purchaser required to look behind the patent. (Bagnell v. Broderick, 13 Peters, 448.)
The bill of necessity admits that the legal title was vested in William Park Lea by the grant as it now stands; as, on any other assumption, the complainant would have his remedy at law, and must be turned out of court. The title has thus stood since 1842; important rights have grown up under it, with which a court of equity cannot interfere, on general principles of justice. (1 Story's Com. on Equity, sec. 64, c. 64, d.) *498 We mean to say, that if the equity conferred by the entry was in William Pinkney Lea, and the patent issued in the name of William Park Lea, and the Mining Company, or those under whom they claim, have innocently and ignorantly purchased and paid for the property, and took legal conveyances for it, with an honest belief that they were dealing for and acquiring a legal title from the true owner, then the complainant cannot be heard to set up his equity behind the grant to overthrow the purchase. (1 Story's Equ., 454.) And so the respondents, the Mining Company, might buy in the legal title of William Park Lea after they had notice, if they were innocent purchasers, holding under John Davis, and Mastin, Keith, & Caldwell. (1 Story Equ., s. 411.)
But it is insisted that the deed from Lea to Davis was not registered, and fraudulently concealed from the complainant, so that he could not proceed to assert his rights. Davis had possession of the land when he took William Park Lea's deed, claiming for himself, and adversely to all others; and he so continued in possession till he sold the land in December, 1852. This adverse possession was in itself notice that he held the land under a title, the character of which the complainant was bound to ascertain. (Landis v. Brant, 10 How., 375.)
Furthermore, Caldwell, Keith, & Mastin, purchased from Davis in December, 1852; they caused the deed from William Park Lea to Davis, and the one from the latter to them, to be duly registered, without having any knowledge of the complainant's claim, and without the existence of any circumstance to put them on inquiry respecting it. They were clearly bona fide purchasers of a legal title, that the complainant cannot assail in equity.
2. The respondents rely on the act of limitations of the State of Tennessee as a protection to their title and possession. The act declares "that where any person shall have had seven years' possession of any lands which have been granted by this State, holding or claiming the same by virtue of a deed of conveyance or other assurance, purporting to convey an estate in fee simple, and no claim by suit in law or equity, effectually *499 prosecuted, shall have been set up or made to said lands within the aforesaid time, then, and in that case, the person or persons, their heirs or assigns, so holding possession, shall be entitled to keep and hold possession of such quantity of land as shall be specified and described in his deed, &c., in preference to, and against all, and all manner of person or persons whatever."
By the settled construction of the foregoing act, an unregistered deed is a sufficient title on which the bar can be founded; and when John Davis's deed from William Park Lea was recorded, it related to its date, and was good to draw the better title to it by force of the statute.
The possessions of John Davis, and Caldwell, Keith, & Mastin, made one possession; and if the two were continuous for the whole term of seven years, then the bar was formed, and the defence complete. This brings us to the fact of actual possession held by Davis, for after he sold to Caldwell, Keith, & Mastin, no one disputes their actual possession.
Davis purchased the improvements on the land from Wallace, 25th February, 1842, for the sum of forty dollars; and by the agreement, Wallace was to hold under Davis and occupy the premises for three years, which Wallace proves he did. He then left the place, and Wilson Abercrombie went into possession under Davis, and occupied the cabin one year. It being in the midst of a small field which was annually cultivated in grain crops, Davis removed the cabin beyond the field, and put it up again on the forty-acre lot, and Abercrombie occupied it another year. He was succeeded by Bailey McCoy as tenant of the cabin under Davis; McCoy occupied it for a year or more. Wallace's field could not have included more than some three acres, and had an orchard of peach trees on it. After the cabin was removed, Davis enlarged the field, and extended it across the southern line of the forty-acre lot, and also enlarged it, from time to time, by small clearings at the other end, (which were made for turnip patches,) until the field included about twelve acres, and which was annually cultivated by Davis, whose residence was within a few hundred yards of the field, on the adjoining section of land. This field *500 was obviously an important part of his plantation. That portion of the twelve-acre field lying on the forty-acre lot embraced, when this suit was brought, about five acres. Mann, the county surveyor, who run the lines of the forty-acre lot, in September, 1855, so states. He proves that the debris and ground plan of the cabin Wallace built and occupied were quite apparent; that the peach trees were there, and that the old and worn land was plainly distinguishable from that more recently cleared up, and which was on its different sides.
To overcome the evidence of continued possession on the part of Davis, two witnesses were produced by the complainant, to wit: Crawford Braswell and Jesse Shubird. The former swears that he resided in Ducktown from June, 1845, to October, 1850; that he knew John Davis, and the place Wallace improved. "I at one time (says he) purposed purchasing that eighty acres where the Wallace improvement was. Davis told me that he had only the occupant of Luther Wallace; that he did not own the land, and that he had moved the improvements off to another place; and, having asked him who owned the land, he stated it was entered by a man by the name of Lea. He stated he had moved off the house and fruit trees, and I think he also named the time." Says he thinks the conversation took place in July, 1848.
In answer to another question, the witness says: "Mr. Davis showed me where he had moved the house from, and I understood he had moved all the improvements off that place, and the stock was running on the land that had been enclosed, and, if any of the fencing was left, I did not notice it. The place was grown up very much with bushes. There might have been some rotten rails scattered where the fence was put, lying among the bushes and saplings."
This is represented, also, as having taken place in July, 1848; and the witness swears that, in the succeeding August, Davis showed him where the Wallace house had stood. He was interrogated, on the part of the complainant, as follows:
Please state whether or not you afterwards heard John Davis set up claim to the Wallace eighty-acre tract; and if so, state when it was, and fully what he said to you on the subject.
*501 Answer. In the winter of 1849, there was a man there from Bradley county, looking at Davis's land, and talking of buying him out. I happened at Davis's at the time, and he requested me not to mention the conversation to any person, that had passed between us, about the land; that if he sold his land to that man, he should sell the Wallace place also.
Question by same. Please state whether that was the first time you heard him assume to own the eighty-acre Wallace tract.
Answer. He did not profess to own it then, but said he should sell it with the balance, if he sold at all.
Interrogatory by same. State whether or not John Davis had the Luther Wallace place enclosed at any time; and if so, state when he had it done.
Answer. If he had it enclosed at any time, it was since I left that country.
To the cross-interrogatories, the witness stated:
Do you say there was no land on the Wallace tract enclosed and in cultivation during the years 1848, 1849, and 1850?
Answer. None in 1848, and none afterwards that I know of.
Are you acquainted with the boundaries of the Wallace land, and can you say, positively, that there was no land on said tract in cultivation during the aforesaid years?
Answer. I was not acquainted with the lines of the tract, and, if there was any in cultivation on the tract, I did not know it.
Can you, then, say positively that no part of the field, about where the old Wallace house stood, was in cultivation during the time mentioned?
Answer. No part of it was in cultivation during the time I lived there.
In your answer to complainant's sixth question, you say he (John Davis) stated that Lea had entered the land. State where that conversation took place, when; and if any person was present, give the name or names.
Answer. This conversation took place at Davis's mill, in the month of July, 1848, and there was no person present.
In your answer to complainant's third question, you say that John Davis told you he had only the occupant right, which he *502 had purchased from Wallace, and that he did not own the land; state exactly what he told you, and at what time.
Answer. In the month of July, 1848, he made the statements I have made in that answer, that he had only bought the improvements from Wallace, and that he did not own the land, and would not sell it, and make a title to it.
Shubird swears that he went to Ducktown to reside in 1848, and lived there about three years; says he knew John Davis, and the Luther Wallace improvement.
The succeeding questions propounded for the complainant, and the answers to them, will best present the material statements of this witness:
State whether or not the Luther Wallace improvement was moved from the place where he first put it up; and if so, state who had it moved, and where it was moved to.
Answer. The houses, fencing, and peach trees, were moved from the place they were first put on the Luther Wallace place. They were moved by John Davis, and put on his own land.
How far were these improvements taken from where Luther Wallace had put them up?
Answer. I can't exactly say, but suppose a half mile or three-quarters.
Please state why John Davis removed these improvements. Tell all you may have heard John Davis say on that subject.
Answer. He (John Davis) stated to me that the reason he moved them was, that he was afraid he would lose his labor, as he had understood a man by the name of Lea had entered the land, and stated that he did not own the land.
State whether or not you ever heard John Davis claim the land where the Luther Wallace improvement was, at any time while you lived with him.
Answer. The Luther Wallace place is now called Copper Hill. I think in about the year 1849, after the copper property came into notice, John Davis set up a claim, and said it.
Do you know whether or not the Luther Wallace improvement or property was left vacant and turned out at the time Davis removed the fencing, &c., away? And if so, state how long it was left vacant.
*503 Answer. The property was left vacant  how long I can't say, but until Davis set up his claim; he then commenced fixing up the fencing again.
On cross-examination, the witness states that he went to Ducktown in March, 1848; that the Wallace house had been removed before; nor was there any enclosed land on the Copper Hill tract when he went there.
He is then further interrogated, and answers:
How can you say, then, as in your answer to complainant's third interrogatory, that the house, fencing, and peach trees, were removed by John Davis, and put upon his own land?
Answer. I heard John Davis say so.
At what time did Davis tell you this, and how did he happen to speak to you on this subject?
Answer. Shortly after I went there  I can't say exactly what time  John Davis and myself, after passing through his farm, passed upon the vacant place of Luther Wallace. He mentioned the subject himself, and told what I have heretofore stated.
On which side of Davis's mill creek was the improvement of which you have been speaking situated?
Answer. It was situated on the left hand when going up the creek.
Was there not, at that time, a small field enclosed between the mill creek and the Copper Hill?
Answer. Not to my knowledge, as I don't know whether there was or not, as I know nothing about it, only as Davis told me that he had taken all off.
Was there any person present when this conversation occurred between you and Davis? If so, state who it was.
Answer. There was no person present.
If the evidence of these two witnesses be true, then there was no continuous adverse holding; and the question is, whether it is entitled to credit? Braswell swears that the entire improvements were removed, including the fruit trees; and that the land where the Wallace improvement had been made was grown up and overrun with bushes and saplings; that this was the condition of the place in 1848. Shubird proves the same, with the exception that he says nothing as *504 respects the undergrowth. So far as conversations with John Davis are given, they may be dismissed, with the remark, that he had obtained William Park Lea's deed for the land in June, 1846, and was not at all likely to carefully disavow all title, and say the land belonged to one Lea.
In 1856, when these depositions were taken, John Davis was dead, and courts of justice lend a very unwilling ear to statements of what dead men had said.
Many witnesses have been examined to prove that Braswell and Shubird are not entitled to credit on oath as witnesses, and many prove the reverse. That they are men of no substantial worth, and of little respectability, is manifest enough, and confidence in their integrity is certainly impaired. But in this case, as in most others, the integrity of the witnesses is easily ascertained. If the land was grown up in bushes and saplings in 1848, it must have been thrown out as a waste place six or eight years before that time. Davis purchased Wallace's possession in February, 1842. Wallace remained there three years by agreement with Davis. Then Abercrombie came in, and occupied the house one year whilst it stood in the field. It was then removed beyond the field, and had no connection with it. Davis himself took possession of the cleared land, and cultivated it. It was rented by Davis to Dugger either in 1849 or 1850, and he raised a crop on it. The orchard was there then, and continued there till 1855, after this suit was brought, as Mann, the county surveyor, proves, who traced the lines of the Copper Hill tract, and examined the cleared land in the twelve-acre field, and especially that part north of the southern line of the forty-acre lot. Mann states that the marks of the old house built by Wallace were plainly visible, and so was the old worn land cleared by Wallace, and that the peach trees were there. Substantially the same facts are proved by nearly all of the witnesses examined on part of the respondents. It is the most familiar fact in the cause.
That the Wallace field and orchard were constantly under fence from the time Davis purchased of Wallace, and certainly never abandoned nor overrun with brushwood and saplings, is fully established.
*505 And our opinion is, that when Braswell and Shubird deposed to the reverse, they stated what was untrue.
The complainant in his amended bill does not controvert the fact that adverse possession, for more than seven years, had been holden of the land in dispute, but relies on the following allegations to avoid the bar, to wit:
Your orator shows the defendants, in their answers on file, charge that the said John Davis and those claiming under him had seven years' peaceable, uninterrupted, adverse possession of the land in dispute, previously to the filing of the original bill, and previous to the suit at law; as to which facts no answer is asked herein from defendants; but if any such possession existed, your orator charges, and which charge your orator does require to be answered, that it was a fraudulent possession, under a fraudulent grant and fraudulent deed, the registration of which was postponed until within about the last two years; that the possession of your orator's grant, first by the said William Park Lea, and then by the said John Davis, was fraudulently concealed from him by them; that he never had any knowledge or information thereof until about the time stated in his original bill, and within the last twelve months; and that, as his cause of action was thus fraudulently concealed, the statute of limitations cannot apply.
These allegations are specially denied by the answer of the respondents, except as to the fact that the deed from William Park Lea to John Davis was not registered, which is admitted. Of the other allegations there is no proof, and of course they are not in the case.
Whether Lea had title or not at the time he conveyed to Davis is altogether immaterial, as the Tennessee act of limitation intended to protect and confirm void deeds purporting to convey an estate in fee simple, where seven years' adverse possession had been held under them. Nor was Davis bound to register his deed from Lea; between them, as grantor and grantee, it was valid without registration. Neither can the complainant be heard to say that he had no notice of the fact that Davis claimed title to the land. His possession and adverse holding was notice to the world, as will be seen by the case of Landis v. Brant, above cited.
*506 On the two grounds above stated, we order that the decree of the Circuit Court dismissing the bill be affirmed.
Mr. Justice DANIEL dissenting:
In the case of Lea v. The Coppermine Company, it is my opinion that the company, as a corporation, could neither plead nor be impleaded in a court of the United States.