182 So. 740

**FOSCUE et al. v. MITCHELL et al.**

No. 34558.

Feb. 7, 1938.

On Rehearing May 30, 1938.

Rehearing Denied July 1, 1938.

Fred Simon and Pugh, Grimmet & Boatner, all of Shreveport, for appellant John W. Foscue.

Yandell Boatner, A. M. Simon, and Pugh, Grimmet & Boatner, all of Shreveport, for appellants.

J. N. Marcantel and Lee & Lee, all of Shreveport, for appellees.

ROGERS, Justice.

John W. Foscue, alleging himself to be the owner of the fee title, and the Magnolia Petroleum Company, alleging itself to be the owner of an oil and. gas lease, of a tract of 160 acres of land in Caddo Parish, brought this suit in jactitation, in which they alleged that defendants were slandering their title to 7.35 acres in the northern

portion of the tract. Plaintiffs alleged that defendants were trespassers on the 7.35 acres of land, and they prayed for a preliminary injunction prohibiting defendants from trespassing upon the seven acre tract and from drilling an oil or gas well thereon.

The trial judge declined to grant the preliminary injunction, and this court affirmed his ruling. Foscue v. Mitchell, 185 La. 963, 171 So. 91.

Thereafter, plaintiffs filed an amended and supplemental petition in which they set forth that since the filing of the suit defendants had completed a producing oil and gas well on the seven acre tract, and, alleging defendant's bad faith, plaintiffs prayed for an accounting of the oil, gas and gasoline produced by the well and for a judgment for the amount found to be due therefor. Plaintiffs also prayed that defendants be ordered to remove the well, its equipment and appurtenances, together with all the structures erected by them upon the premises.

Defendants denied plaintiffs' possession of the seven acre tract, and alleged, on the contrary, that the defendants, Minnie A. Mitchell, widow of W. H. Mitchell, and the heirs of William H. Mitchell, Senior, held title thereto by the prescription of thirty years under Articles 852 and 3499 of the Civil Code, and that by reason thereof, defendants, and not plaintiffs, have been in possession of the tract of land in dispute. Defendants admitted that they had drilled an oil and gas well on the tract and that the products thereof were being disposed of by the McAlester Fuel Company, one of the defendants. They alleged that they were in good faith in drilling the well, and they prayed that in the event the court should find that plaintiffs are in possession of the seven acre tract, the right be reserved to the defendants R. L. Bauman and McAlester Fuel Company to recover their reasonable costs for drilling, equipping and operating the well.

After hearing the merits of the case, the trial judge rendered judgment in favor of plaintiffs as prayed for in the original petition; ordering the removal of the well as far as possible and also ordering an accounting. Defendants applied for and were granted a rehearing. On the second hearing of the case judgment was rendered in favor of defendants rejecting plaintiffs' demands. Plaintiffs have appealed.

At the outset it is necessary to dispose of plaintiffs' contention that defendants have converted this jactitation suit into a petitory action by their allegation of ownership. We do not find any force in the contention. In McConnell v. Ory, 46 La.Ann. 564, 15 So. 424, cited by plaintiffs, there was apparently no question raised as to the possession of plaintiff. Under the cardinal principles governing petitory actions, the ruling in the cited case is not appropriate in the present case.

No one who alleges that he is in possession can maintain a petitory action. He must allege possession in the other party. It cannot be said that the defendants here are plaintiffs in a petitory action, when they specifically deny the possession of the original plaintiffs and

specifically assert their own possession as owners.

Plaintiffs, in their petition, set out in detail the chain of title under which they claim ownership, but it is apparent from the prayer of the petition that plaintiffs' title is pleaded only for the purpose of showing the character and extent of the possession relied on.

The defendants, in their answer, plead the prescription of thirty years under Articles 852 and 3499 of the Civil Code, but it is also apparent from the prayer of the answer that such prescriptive title is pleaded solely for the purpose of showing the character of defendants' possession.

In other words, a record title is pleaded by the plaintiffs to show the character of their possession and a prescriptive title is pleaded by the defendants to show the character of their possession. But neither plaintiffs, in their petition, nor defendants, in their answer, prayed to be recognized as owners of the property the possession of which is in dispute.

In determining whether a suit is a jactitation suit or a petitory action, the averments of the petition and answer must be construed in connection with their respective prayers, which fix the character of plaintiff's action and the nature of the relief sought by the defendant. Siegel v. Helis, 186 La. 506, 172 So. 768; Rudd v. Land Company, 188 La. 490, 177 So. 583.

The allegations and prayer of the petition and the allegations and prayer of the answer stamp this proceeding as a jactitation suit and not as a petitory action.

As shown by the record, John W. Foscue, the plaintiff, acquired from B. D. Foscue by warranty deed, dated August 29, 1884, a tract of land containing 160 acres and composed of the SE¼ of NE¼, E½ of SE¼ and SW¼ of SE¼, Sec. 20, T. 23 N, R. 16 W, Caddo Parish, Louisiana. The deed was filed for record on February 16, 1894, and was recorded in Book 14, p. 261 of the Conveyance Records of Caddo Parish.

Included in the 160 acre tract acquired by John W. Foscue from B. D. Foscue, along the North line of and comprising a portion of the SW¼ of SE¼ of Sec. 20, T. 23, R. 16, is a tract of land containing 7.35 acres, which is fully described in the petition.

In the year 1896, William H. Mitchell, Senior, purchased the improvements of one Thompson, who held a government claim and was trying to homestead a tract of land adjoining the Foscue tract on the North. These improvements consisted of a small clearing and a little cabin. Mr. Mitchell and his wife, Mrs. Minnie A. Mitchell, moved into the cabin in the month of December, 1896. About that time Mr. Mitchell filed a homestead entry under the federal laws on the tract of land that Thompson had been trying to homestead. This tract contained 112 acres, was described as the SW¼ of NW¼ and the NW¼ of the SE¼, Sec. 20, T. 23 N., R. 16 W., Caddo Parish, and lay immediately North of the seven acre tract owned by the plaintiff, Foscue.

Receiving a patent to the 112 acre tract in the year 1903, Mr. Mitchell gradually cleared up more land and built a fence around the South boundary of the seven acre tract. Later developments disclosed that the seven acre tract was not included in the 112 acre tract homesteaded by Mr. Mitchell, but was a part of the 160 acre tract owned by Mr. Foscue.

Mr. Mitchell and his family lived in the cabin built by Thompson until the year 1912, when he built a more pretentious home considerably to the North but still on the seven acre tract, although it is possible that some portion of this house may have been located on the Mitchell homestead. The Mitchell family continued to live in the newly built house until about the year 1920 and to cultivate the land included in the seven acre tract. In 1920, Mr. Mitchell bought a home near Vivian, Louisiana, and moved his family there, but he continued to cultivate the seven acre tract in whole or in part until he died in the Spring of the year 1935.

It is not disclosed by the record what became of the house constructed on the tract by Mr. Mitchell, but it is certain that no part of the house was on the tract in the year 1936, except a few old rocks which were hidden in the weeds.

The seven acre tract was under fence, constructed by Mr. Mitchell in 1897, until the year 1928, when the Police Jury of Caddo Parish passed a no fence law. Thereafter, the fence was permitted to decay, although vestiges of the fence were found in place, when a new fence on the same location was erected by the Mitchells in the late Spring of 1936.

With the exception of its Northern boundary, the seven acre tract is irregular in shape. Its width varies from a few feet to 300 feet, and there are many turns and angles in it. The fence which Mr. Mitchell erected around the South end of the tract was not erected to serve as a boundary fence, but merely for the purpose of following the irregularities resulting from the gradual clearing of the land.

In 1884, when the land here involved was acquired by the plaintiff, Foscue, it was covered with a pine forest. Foscue's first important act of ownership, after acquiring title, was to sell all the pine timber 14 inches and over in diameter on the tract to the Black Bayou Lumber Company. This was in the year 1899. The lumber company went upon the land and conducted extensive lumbering operations thereon for four or five years. It constructed a tram road across the property, removed all the pine timber 14 inches and over in diameter, as it was authorized to do under its purchase, and, in addition, cut a large amount of timber below 14 inches in diameter. The cutting of this smaller timber resulted in the successful prosecution of a suit for damages by Mr. Foscue against the lumber company. Foscue v. Black Bayou Lumber Co., 118 La. 725, 43 So. 387.

In the year 1925, Mr. Foscue again sold the timber on his tract of land to W. K. Henderson, and lumbering operations were

conducted on the land for sometime thereafter by Mr. Henderson or his assigns.

In the month of January, 1933, Mr. Foscue executed a mineral lease covering the land to R. W. Norton; and in the month of July, 1936, Norton assigned the oil rights covered by the lease to the Magnolia Petroleum Company. Both lease and assignment were duly recorded in the Conveyance Records of Caddo Parish.

After the Mitchell heirs had erected a new fence enclosing the seven acre tract in the Spring of 1936, they executed a mineral lease covering the tract to C. P. McCrary and A. Holiby. This was in the month of August, 1936; and in the same month McCrary and Holiby executed an assignment of the lease to R. L. Bauman and the McAlester Fuel Company. Both lease and assignment were duly placed on record in the Conveyance Office of Caddo Parish.

Subsequently, the assignees of this mineral lease went upon the seven acre tract and began the construction of a building and a derrick with the view of conducting drilling operations thereon. This suit promptly followed.

From what we have said, it is clear that Mr. Foscue went into actual, physical possession of his property a few years after he had acquired title thereto in 1884. Under Articles 3443 and 3442 of the Civil Code, this possession has continued at all times since, and gives plaintiffs the right to a possessory action to maintain his possession against any disturbance.

This proposition is not disputed by defendants, except as to the strip of Mr. Foscue's land which was occupied and cultivated by Mr. Mitchell from 1896 to 1935. As to this strip of approximately seven acres of land, defendants contend that the possession of Mr. Foscue must yield to that of Mr. Mitchell.

Under the evidence contained in the record there cannot be any doubt as to the actual physical possession of the Mitchells for more than thirty years. Defendants contend that this possession was as owners and plaintiffs contend that it was merely by the sufferance or permission of Mr. Foscue.

In the beginning and for several years thereafter, Mr. Mitchell's possession of the seven acre tract was plainly as owner under his mistaken belief that it formed part of his 112 acre homestead tract. But the evidence also plainly shows that some years later, Mr. Mitchell discovered the true situation. In the suit brought by Mr. Foscue against the Black Bayou Lumber Company, Mr. Mitchell testified about the logging operations of the lumber company, and in the course of his testimony stated that he knew the lines of Foscue's property. Mr. Gryder, one of the witnesses in this case, testified that he assisted in making a survey of the property for the Black Bayou Lumber Company, in which the line separating the Mitchell property from the Foscue property was run, and that Mr. Mitchell was present at the time. Again, in 1925, Mr. Mitchell pointed out to Mr. Foscue and Mr. Reynolds, a timber estimator, the dividing line between the Mitchell and the Foscue properties. When Mr. Reynolds commented upon the culti-

vation across the line of Mr. Foscue's land, Mr. Mitchell readily agreed with the comment and stated that he probably owed Mr. Foscue some rent for the use of the land. Mr. Foscue, however, declared that he had no use for the land and that he did not want any rent therefor, but he did request Mr. Mitchell to look after his land for him and to report any depredation thereon. Later, Mr. Foscue saw Mr. Mitchell in regard to some reported trespass on the land, and Mr. Mitchell told Mr. Foscue that he had already looked into the matter and that the person who had occupied the land under the belief it was public land had moved off.

There is other evidence in the record, not necessary to detail, which taken together with the evidence to which we have referred convinces us, as it did the trial judge, that Mr. Mitchell prior to 1906 knew the true boundary line between his homestead and the land of Mr. Foscue, and that thereafter he continued to know and acknowledge that the seven acre tract which he was occupying and cultivating did not belong to him but to Mr. Foscue; and that he did not continue to possess the tract as his own but merely by the sufferance or permission of Mr. Foscue.

Under our appreciation of the facts of this case, as shown by the record, defendant's plea of thirty years prescription acquirenda causa is not well founded. The question is not whether the acknowledgment on the part of Mr. Mitchell that he did not possess as owner, but merely with the consent or by sufferance of Mr. Foscue, the real owner, was sufficient to interrupt the running of the thirty years prescription. The question is whether the possession of Mr. Mitchell relied on by the defendants was in the character and under the claim of ownership throughout the entire prescriptive period of thirty years.

Article 3499 of the Civil Code provides: "The ownership of immovables is prescribed for by thirty years without any need of title or possession in good faith." And Article 3500 of the Civil Code provides: "The possession on which this prescription is founded must be continuous and uninterrupted during all the time; it must be public and unequivocal, and under the title of owner."

The cases are uniform in holding that the possession must not only begin but also that it must continue as owner and adverse to the true owner. Davis v. Young, 36 La.Ann. 374; City of New Orleans v. Shakspeare, 39 La.Ann. 1033, 3 So. 346; Laurent v. Laurent, 146 La. 939, 84 So. 212; Dew v. Hammett, 150 La. 1094, 91 So. 523.

Thus, in City of New Orleans v. Shakspeare, it was held that if it appears that the party who pleads the prescription of thirty years under Article 3500 of the Civil Code acknowledged at any time before the possession covers the space of thirty years, that the title of ownership was in his opponent, his plea is defeated, and his alleged ownership is destroyed.

Although good faith is not a necessary ingredient of the thirty years' prescription, uninterrupted and continuous possession as owner for the entire time

necessary to prescribe is essential to acquire title by thirty years' possession.

Whatever may have been the character of Mr. Mitchell's possession of the seven acre tract at the outset, it was completely changed subsequently. The statements and conduct both of Mr. Mitchell and of Mr. Foscue show that Mr. Mitchell's possession was not as owner, but that it was precarious and by sufferance, under the exclusive title of ownership held by Mr. Foscue.

The possession of Mr. Mitchell, enjoying the occupancy and use of the land, with the permission or indulgence of Mr. Foscue, was, in fact and in law, the possession of Mr. Foscue. Civ.Code, art. 3490.

The codal article provides:

"The circumstance of having been in possession by the permission or through the indulgence of another person, gives neither legal possession nor the right of prescribing.

"Thus, those who possess precariously, that is, by having prayed the master to let them have the possession, do not deprive him thereof, but, possessing by his consent, they possess for him."

Defendants attempt to escape the effect of the facts showing Mr. Mitchell's intent was not to possess the seven acre tract as owner, but merely to possess it by the permission or through the indulgence of Mr. Foscue, by arguing that once prescription has begun to run in favor of an adverse possession, it cannot be interrupted other than by an express and unequivocal acknowledgment made for the purpose and with the intention of interrupting the running of prescription. The argument is founded on certain decisions of this court holding that in order to interrupt the running of prescription in the case of mineral servitudes, the acknowledgment must be clear and specific and made for the purpose and with the intention of interrupting the accruing prescription. The argument finally prevailed with the trial judge, resulting in the judgment in defendants' favor.

We do not think the argument is appropriate to this case. In any event, we think it overlooks the fact that a possessor of immovable property may evidence his intent not to possess as owner by acts or conduct indicating acknowledgment of the adverse title. Civ. Code, art. 3520; City of New Orleans v. Shakspeare, 39 La.Ann. 1033, 3 So. 346.

The acknowledgment which constitutes an interruption that may defeat the adverse possessor's claim of title is a factor separate and apart from the essential elements by which title may be acquired by adverse possession. The acknowledgment cannot be so restricted as to eliminate from the law one of the essential elements which must be established in order to acquire title by the mere possession for the time necessary to prescribe. Article 3520 of the Civil Code merely established a means to prevent what might otherwise be the effect of such possession. The acknowledgment may be sufficiently broad to evidence the intent of the possessor no longer to possess as owner, or to show that his original intent was not to possess as owner. But this is not

essential. The intention of the possessor not to possess as owner or his acknowledgment of title in another may be shown, and the effect of either is sufficient to defeat the claim of ownership by prescription. However, in this case, the evidence clearly shows both the intent of Mr. Mitchell not to possess as owner and his acknowledgment of Mr. Foscue's title. This is sufficient to defeat any claim of title by the widow and heirs of Mr. Mitchell in this case.

Nor can defendants maintain their claim of title under the prescription of thirty years as provided by Article 852 of the Civil Code. The prescription referred to in the codal article is a boundary prescription. Opdenwyer v. Brown, 155 La. 617, 99 So. 482. That prescription is not applicable to this case, since the irregular fence which was erected from time to time on the South end of the seven acre tract was never intended to serve and never served as a boundary or dividing line between the property of Mr. Mitchell and the property of Mr. Foscue. Moreover, there is no definite proof in the record that the fence was maintained for thirty years.

In passing upon the question of the good faith of the defendant lessees, the trial judge, in his written reasons accompanying his judgment in plaintiffs' favor on the first hearing of this case, had this to say, viz.:

"Next taking up the question of the good faith of the defendant lessees. The case of Nabors Oil & Gas Company v. Louisiana Oil Refining Company, 151 La. 361, 91 So. 765, and Southwestern Gas & Electric Company v. Nowlin, 164 La. 1044, 115 So. 140, furnish a full and complete discussion on

the question of good faith, and the relative rights of the parties. Under these authorities, even if these lessees had been in good faith prior to the institution of this suit, they then became in bad faith, and cannot recover for anything from that time on except it be for the preservation of the property, or that enhanced the property and could not be removed. And they are likewise liable for the oil, gas, etc., from the property under the same restrictions.

"Counsel for defendants has cited the case of Jeems Bayou Fishing & Hunting Club v. United States, 260 U.S. 561, 43 S.Ct. 205, 67 L.Ed. 402, to the effect:

"'The damages for removing oil from public land are the value of the oil removed after deducting the cost of drilling and operating the wells by means of which it was removed by persons in possession, claiming title in good faith.'"

"This is the way the syllabus reads, but the case itself is a little bit different in that it holds that the possessors were in good faith. The case is bottomed on the Mason Case, Mason v. United States, 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396, which immediately preceded it in the reports. In the Mason Case the possessors were held in good faith and the Court held that it was bound by the Civil Code of Louisiana. The case and the Code itself would be applicable if these lessees had drilled the well in good faith. But they drilled this well and incurred all the expense after this suit was brought, and in the main the expense was incurred after these lessees knew of the evidence in regard to the interruption, and if they saw fit to ignore

the same, or to put their own interpretation on it, then they did so with their eyes open.

"The plaintiffs having elected not to keep the well, the question then comes up whether the well could be considered in the light of preserving the property, or enhancing its value in any way inasmuch as the well itself cannot be removed. Under the testimony, it was an unnecessary well, and a detriment rather than a benefit to the Foscue property. Therefore, the plaintiffs are not obligated to reimburse the defendant lessees for the cost of drilling, equipping and operating the. well, but have the right to compel the removal of said well as far as possible, and all equipment and other structures."

We think the foregoing reasons of the trial judge on the question of the good faith of the defendant lessees are amply supported by the facts and the law of this case.

For the reasons assigned, the judgment appealed from is annulled, and it is now ordered that there be judgment in favor of plaintiffs and against defendants quieting plaintiffs in the possession of the property described in their petition, and enjoining defendants from disturbing plaintiffs in the quiet and peaceful possession of their said property.

It is further ordered that defendants institute suit against plaintiffs asserting their title to the said property within sixty days after this judgment shall become final, and that in default thereof, the defendants shall be thereafter forever barred from setting up any claim, right or interest in, to or on the said property, and that the instruments described in Articles 9, 10 and 11 of plaintiffs' petition be ordered cancelled and erased from the conveyance records of Caddo Parish, Louisiana.

It is further ordered that there be judgment in favor of plaintiffs and against the defendants, ordering the defendants to remove the well located on the property described in the petition, the equipment and appurtenances thereto belonging, together with all structures erected by defendants on the said premises, in such manner as not to injure or damage the premises and to leave them in a safe condition.

It is further ordered that there be rendered an accounting by defendants to plaintiffs, without deduction for the cost of drilling, equipping and operating the well on the property described in the petition, and that there be judgment in favor of plaintiffs and against defendants for such amount as the court may find they are entitled to, with legal interest thereon as provided by law, and this case be remanded for the purpose of said accounting and judgment.

It is further ordered that all costs of this suit be paid by the defendants.

FOURNET, J., absent.

O'NIELL, C. J., dissents.

On Rehearing.

LAND, Justice.

(1) The main defense relied upon by defendants is their possession as owners of the 7.35 acres in dispute, continuously in excess of thirty years. Such a possession has the effect of vesting in defendants a prescriptive title to the property. Article 3499 of the Revised Civil Code provides: "The ownership of immovables is prescrib-

ed for by thirty years *without any need of title* or possession *in good faith."*

As to the facts of possession in the defendants, the Judge of the lower court said in his written opinion in this case:

."In the early Nineties, Mr. W. H. Mitchell, the deceased husband and father of the defendants, bought out the improvements of one Thompson, who held a government claim and was trying to homestead. The improvements consisted of a little clearing and a small house. Mr. and Mrs. Mitchell moved into the house in *December, 1896,* and made a homestead entry on certain land lying immediately north and adjoining the tract on which the house was situated. Finally receiving a patent in 1903, Mr. Mitchell gradually cleared up more land *and built a fence around the south boundary of the Seven Acre Tract.* Later developments showed that the Seven Acre Tract was not included in the homestead land but was a part of Mr. Foscue's property, and lay immediately south of and adjoining the homestead.

"Mr. Mitchell and his family lived in the original house built by Thompson for some *four or five* years, and then built another house considerably north *but still* in the main, *on the Seven Acre Tract.* Some part of this last house may have been on the homestead. He and his family lived in this last house until about 1920, and cultivated the land included in the Seven Acre Tract. He moved away in 1920 to some place near Vivian, *but continued to cultivate in whole or in part the Seven Acre Tract until 1935,* dying in the spring of 1935. What became of the last house

on the property is not disclosed by the record, but no part of it was there in 1936, except a few old rocks hidden in the weeds.

 *     *     *     *     *

"*Under the evidence, there cannot be any doubt as to the actual physical possession of the Mitchells for more than thirty years,* but the main question is whether this possession during all of those years was as owner, or merely by the sufferance and permission of Mr. Foscue." (Italics ours.)

(2) In the original opinion of this Court, after reviewing the facts of the case, it is said:

"Under the evidence contained in the record *there cannot be any doubt* as to the actual physical possession of the Mitchells *for more than thirty years.* Defendants contend that this possession was as owners and plaintiffs contend that it was merely by the sufferance or permission of Mr. Foscue." (Italics ours.)

(3) To offset the admitted actual possession of the Mitchells and its legal effect, plaintiffs rely upon the evidence of three witnesses who testified that W. H. Mitchell, deceased, during his lifetime *verbally* acknowledged title to the Seven Acre Tract in John W. Foscue, one of the plaintiffs.

One of the witnesses of plaintiffs is Sam Mitchell, a son of W. H. Mitchell, deceased. He is an employee of the Magnolia Petroleum Company, one of the plaintiffs in the suit, who acquired the mineral lease made by Foscue to R. W. Norton. He testified that he was forty-two years old, at the time of the trial of the case, and that when he was a boy *eleven or twelve years old,* his father, W. H. Mitchell, deceased,

met Mr. Foscue near the 7.35 acre tract in dispute, and asked Mr. Foscue if he wanted anything to show he had the land in possession and he told him no, to go ahead and cultivate it, that he was not uneasy as long as he lived. T. 171, 172, 173.

That a boy of *eleven or twelve years of age* would appreciate the significance of, or remember, *word for word,* a conversation of this character *thirty years afterwards,* is not only unreasonable, but incredible. If such a conversation took place, it is passing strange that Mrs. Minnie Mitchell, the mother of the witness, and his brothers and sisters never heard the husband and father make any statement during his lifetime that cast any doubt upon his possessing as owner. Besides, Mr. Foscue, as a witness in his own behalf, had no recollection of such conversation. T. 335; 341; 367 and 368; 351 and 352; 363; 372. T. 438, 439. (Testimony of Foscue.)

Although plaintiffs seek to corroborate the testimony of Sam Mitchell during a visit made by him to Mr. Jim Houston for the purpose of securing his advice, when the matter of leasing the 7.35 acre tract came up, yet the testimony of Mr. Houston fails to show, upon the occasion of this visit, that Sam Mitchell told him of any conversation between Mr. Mitchell and Mr. Foscue in 1905 or 1906, or at any other time.

With reference to this visit, Mr. Houston said:

"Q. I would like for you to state in substance, Mr. Houston, what Sam said to you on that occasion.

"A. Sam came in the bank and brought a lease along with him, and said he wanted me to look over it then. I looked at it and I asked Sam if he owned any of the land or claimed any of it. He said 'No.' I said 'You do not have any right to sign it.' I asked Sam 'What would your father do about it?' He said he didn't believe his father would claim it. I told Sam that I would not sign the lease." T. p. 480.

Mr. Foscue was the only possible witness who could have corroborated the testimony of Sam Mitchell as to the alleged *verbal* acknowledgment of his father to Mr. Foscue made thirty years ago. The only persons stated to be present at this alleged conversation by Sam Mitchell were Mr. Mitchell, the deceased, Mr. Foscue, and Sam Mitchell, son of the deceased. Mr. Foscue failed to corroborate this statement of Sam Mitchell.

If the testimony of Sam Mitchell as to the conversation that he said took place between his father and Mr. Foscue was true, this witness already knew that "he did not own any of the land or claimed any of it", at the time of his visit to Mr. Houston, and why should this witness seek the advice of Mr. Houston as to signing the lease, as such advice was wholly unnecessary. Why should he state again that *"he didn't believe his father would claim it"?*

The answer to these questions is obvious. This witness was attempting to manufacture some evidence, *of a more recent date,* that his father did not claim the land as owner, but held it merely by the sufferance of Mr. Foscue. All of this evidence, however, is but a repetition, in a different form, of the

uncorroborated testimony of this witness, and in what possible way can such evidence be considered as a corroboration of his testimony as to a *verbal* acknowledgment of his father alleged to have been made thirty years ago?

Mr. Houston does not testify to any independent fact within his own knowledge that tends to corroborate the testimony of Sam Mitchell, who did not sign the lease, it is true, as advised by Mr. Houston. Yet in direct contradiction of his statement to Mr. Houston, "that he did not claim any of the land", Sam Mitchell demanded of and received from his mother $1,250.00 cash for a deed conveying his interest to her. T. 38 and 39; 176, 429.

It is indeed most unnatural that Sam Mitchell, the son of W. H. Mitchell, Sr., deceased, should take the witness stand in this case and testify against the ownership by his widowed mother and by his brothers and sisters, of this tract of valuable oil land. That his testimony was fabricated cannot be doubted.

As stated by defendants in brief filed January 5, 1938, at page 20:

"The record shows that Sam Mitchell refused to sign the oil and gas lease that was executed by his mother, brothers and sisters, covering the Seven Acre Tract, giving as his reasons that if he did, he would lose his job with the Magnolia Petroleum Company, and the record makes it clear that in the negotiations which resulted in Sam Mitchell being paid $1250.00, to quit-claim his interest to his mother, he, at no time, made any statement that indicated that his father did not claim, during his lifetime the Seven Acre Tract. In fact, he repeatedly stated in the presence of his mother, to Mr. Elmo P. Lee, attorney for the lessees, that his father did claim it, and had been in physical possession of it from about the year 1896. Tr. p. 529."

Again it is stated by defendants in their brief at pages 21 and 22:

"That Sam Mitchell was actuated by a fear that he would be discharged by the Magnolia Petroleum Company, on account of the family claim to said tract, just as he had previously been discharged by R. W. Norton on account of said claim by his family, is clearly shown by the testimony. Mr. F. G. Rives, field superintendent of R. W. Norton, on the trial of the merits, beginning at page 491 of the transcript, testified that he, as Superintendent for R. W. Norton, discharged Sam Mitchell on account of the claim his family was asserting to said Seven Acres, and that he so informed Sam, when he discharged him.

"F. G. Rives, as a witness for plaintiffs, said:

"Q. Would you mind telling us why he was discharged?

"A. Well I really believed at that time that Sam might have been telling me one thing and doing something different.

"Q. About what?

"A. *About the influencing of his people to encourage this claim.*

"Q. This claim against the Seven Acres?

"A. Yes. However, I was badly mistaken, *I guess.* Sam tried to tell me, that he was not, that he was not encouraging

them; *that he was trying to discourage them.*

"Q. Did you tell him when you let him out that you were letting him out because of the fact that he was having something to do with the leasing of this seven acres?

"A. Yes, I told him that I thought that.

"Q. *Told him you thought it and you told him you were letting him out on that account?*

"A. Yes." Tr. 497 and 498.

(4) The other two witnesses relied upon by plaintiffs to establish *verbal* acknowledgments by W. H. Mitchell, deceased, are John W. Foscue, one of the plaintiffs, and a timber estimator employed by Mr. Foscue, by the name of Reynolds.

The testimony of each is as follows:

By Mr. Foscue:

"Q. You heard Mr. Reynolds testify about Mr. Mitchell going with you?

"A. Yes sir.

"Q. Did Mr. Mitchell go with you over the property?

"A. Yes.

"Q. Did anyone else go along?

"A. No one except Mr. Reynolds.

"Q. Were you present when the party came to the Seven Acres that is now in controversy?

"A. Yes, I was.

"Q. What was said about the Seven Acres at the time, Mr. Foscue?

"A. Well, as near as I recall Mr. Mitchell and Mr. Reynolds—Mr. Reynolds said

'Some one is cultivating part of your land.' Mr. Mitchell said 'Yes.' *He did not say it was through error,* but he said '*I suppose I might owe* something for cultivating it.'

"Q. Was anything else particularly said about the money?

"A. *I think* that I told him, I had a good deal of land and it was not bringing in anything, and I did not object to his cultivating it, as long as he knew it was my land.

"Q. After the occasion when you were up there with Mr. Reynolds and these comments were made about possibly paying you some rent, *when if at all, was that subject discussed* after that between you and Mr. Mitchell?

"A. On some trip made there, but I don't remember how long afterwards it was.

"Q. On that subsequent trip, what was said about the matter?

"A. I believe that I had been notified that some one was squatting on my land and I never knew where the lines were *and I went to Mr. Mitchell's house, South East of Vivian to see him,* and get him to go with me. He said 'You rest easy on that. I saw these parties and they were under the impression it was public land, and as soon as they found it was your land they moved off'. He then promised that he would look after the timber in connection with my land." T. pp. 201 and 202.

"Cross-Examination.

"Q. Mr. Foscue I understood you to say that you were in there about 1870?

"A. Yes, sir, 1873 or 1874—somewhere along in there.

"Q. I also understand you to say that from 1884 until about 1902 that you had never been on the property that you claim possession of?

"A. Well whatever year it was that the Black Bayou (Lumber Co.) began in there. Somewhere around 1900—somewhere around there.

"Q. At that particular time did you go to the seven acres which is involved in this suit?

"A. Well where this goes, we went in there to estimate timber.

"Q. Well then did you go on this seven acres?

"A. Well I might have but I don't remember now.

"Q. *When is the first time* that you went on this seven acres that is involved in litigation in this suit?

"A. *The first time* I was there was when I was there with Mr. Reynolds when he was estimating timber *in 1925.*

"Q. You had never, before this particular time, been on this seven acres?

"A. I don't know. I have been along there so many times I could not remember.

"Q. You could not swear?

"A. No, sir. Tr. pp. 207 and 208.

"Q. Independent of that one trip that you made there with. Mr. Reynolds *in 1925,* you say that you have never seen Mr. Mitchell or any of his family out there on this seven acres of land that is involved, or on his land north of that.

"A. Well there were several there on the place.

"Q. *But, you never met Mr. Mitchell?*

"A. *Well I met him in 1925.*

"Q. *Before 1925?*

"A. *Not that I remember of. I might have but I don't remember now.*

"Q. Mr. Foscue, did Mr. Mitchell *ever promise to pay you any rent* on that land?

"A. *No, sir, just said 'I suppose I owe you a little bit.'*

"Q. Do I understand you to say that he said 'I suppose I may owe some rent?'

"A. Yes, that was the substance.

"Q. Has he ever promised to pay any land rent?

"A. I never asked him for rent. T. p. 209.

"Q. On the occasion when you asked him to investigate whether or not there were some squatters on your land, did he promise on that occasion to pay you any rent on that seven acres?

"A. No, sir.

"Q. There was nothing said about it, was there?

"A. No, sir, he just said that he would look after my lands.

"Q. He would see that no one cut the timber?

"A. Well, keep me posted.

"Q. That was all that was said?

"A. That is all that I remember." **Tr.** p. 211.

Mr. Foscue testifies positively that *the first time* he was on this seven acre tract was "when I was with Mr. Reynolds esti-

mating the timber *in 1925*". He further testifies that he met Mr. Mitchell in 1925, and does not remember meeting him before 1925, and that no one else went along *"except Mr. Reynolds"*.

Mr. Reynolds also testified that it was in May 1925 that he and Mr. Foscue and Mr. Mitchell were on the seven acre tract, and that *no one else was along with them.* T. 184, 185.

This testimony brands as utterly false the testimony of Sam Mitchell, who testified that *in the year 1906, when he was a boy twelve years old,* his father, W. H. Mitchell, deceased, met Mr. Foscue near the 7.35 acre tract and that his father made the alleged *verbal* acknowledgment to which he has testified in this case. Sam Mitchell is therefore eliminated in this case as a witness unworthy of belief.

(5) The other witness, besides Mr. Foscue, relied upon by plaintiffs to establish *verbal* acknowledgments by W. H. Mitchell, deceased, is a timber estimator employed by Mr. Foscue, by the name of Reynolds.

"By Mr. Reynolds:

"Q. Do you recall going to the tract of land, marked on the map in pink, which tract is south of Northwest Quarter of the Southeast Quarter of Section Twenty, during the course of your cruise of this tract of timber?

"A. Yes, sir.

"Q. What, if anything did Mr. Mitchell say about that tract?

"A. We went to the corner and come down to the field that was in cultivation and he showed me the line through, and I says, Mr. Foscue, someone is working part of the land and he says 'Yes by mistake I am working part of Bro. Foscue's land here.'

"Q. Through mistake he was working part of Mr. Foscue's land.

"A. Yes, sir. He showed me the line there, pointed to it, we did not follow it, he pointed it across the field.

"Q. Was working part of Bro. Foscue's land.

"A. Yes, sir.

"Q. Not anything further mentioned about the matter, or giving him something to show for it?

"A. Yes, sir, said he would pay rent or something, said he was going to pay a little rent or something like that. We were not there but a very few minutes.

"Q. Who made the remark about paying rent?

"A. Mr. Mitchell.

"Q. Mr. Mitchell.

"A. Yes, sir." T. pp. 185 to 186.

"Cross-Examination.

"Q. You thought that there was something said about rent?

"A. The best that I remember there was a conversation about that.

"Q. What was said about it?

"A. If I remember right he made the remark *'I expect* that I owe Bro. Foscue *a little rent* on this piece of land'.

"Q. Expect I owe a little rent?

"A. Yes, sir 'I *should pay* Bro. Foscue a little rent'.

"Q. Should pay a little rent.

"A. Yes, sir.

"Q. He said that?

"A. '*I expect* I owe it'.

"Q. Mr. Foscue was there?

"A. Yes, sir, stood there talking about it.

"Q. Would you testify that Mr. Mitchell told Mr. Foscue that he was *going to pay rent?*

"A. Didn't say he was *going to,* says 'He *should pay it.*'

"Q. Would you testify that Mr. Mitchell *told or promised* to pay rent?

"A. He did not say '*I* promise,' says 'I *should* do it.'

"Q. Didn't say that *he agreed to?*

"A. No, He says 'I *should pay* a little rent on it.'" Tr. pp. 192 and 193.

Neither Mr. Foscue nor Mr. Reynolds testified that Mr. Mitchell *paid* any rent, or even *agreed* to pay any rent for the 7.35 acres in dispute in this case.

Mr. Foscue testified: "Mr. Reynolds says 'Some one is cultivating part of your land.' Mr. Mitchell said 'Yes.' *He did not say it was through error,* but he said 'I suppose *I might owe* something for cultivating it.'"

Mr. Foscue also testified:

"Q. Mr. Foscue, did Mr. Mitchell ever *promise* to pay you any rent on that land?

"A. *No, sir, just said 'I suppose I owe a little bit.'*"

Mr. Reynolds testified:

"Q. Would you testify that Mr. Mitchell told Mr. Foscue that he was *going to* pay rent?

"A. Didn't say that he was *going to,* says 'He *should* pay it.'

"Q. Would you testify that Mr. Mitchell told or *promised* to pay rent?

"A. He did not say 'I *promise*' says 'I *should* do it'.

"Q. Didn't say that *he agreed to?*

"A. No, sir, says 'I *should* pay a little rent on it.'"

Mr. Foscue also testified: "I *think* that I told him (Mitchell) I had a good deal of land that was not bringing in anything and that I did not object to his cultivating it, as long as he knew it was my land."

However, there is nothing in Mr. Reynold's testimony to this effect. He does not even suggest such a thing. Little effect therefore can be given to the statement that "*I think* that I told him". To *think* that he told him does not establish the fact *that he told him.* Necessarily, this Court is not justified in concluding that as a result of the conversation Mitchell was told by Foscue that he did not want any rent for the small acreage, and that he could go on cultivating it.

(6) The above *verbal* acknowledgments attributed to William H. Mitchell, a dead man, are far from being sufficient to express *any clear or specific intention* on his part to interrupt the accruing prescription

of 30 years, 29 years of which had accrued in the year 1925, when these alleged *verbal* acknowledgments are testified to by the two witnesses to have been made.

The testimony as to the oral statements of a person deceased is regarded by the courts as *the weakest kind of evidence,* and subject to *the closest kind of scrutiny.* Bodenheimer v. Executors of Bodenheimer, 35 La.Ann. 1005; Bringier v. Gordon, 14 La.Ann. 274; Lea v. Polk County Copper Co., 21 How. 493, 16 L.Ed. 203; 22 Corpus Juris, Sections 318 and 319, pages 289, 290, 291.

In Bodenheimer v. Executors of Bodenheimer, 35 La.Ann. 1005, a leading case by this Court, it was held:

"Extra-judicial admissions of a dead man *are the weakest of all evidence,* since they cannot be contradicted, and no fear of detection in false swearing impends over the witness." (Italics ours.)

With reference to such admissions *so as to interrupt prescription,* this Court in Bringier v. Gordon, 14 La.Ann. 274, in the body of the opinion, said:

"The evidence offered consists of the verbal admissions or acknowledgments of the deceased, to a single witness, made at a particular time and place, when the deceased and witness were alone.

"The impossibility of contradicting a witness, under such circumstances, and his entire immunity from temporal punishment for false swearing, have induced the courts to receive such testimony with disfavor, and to declare it *the weakest*

*species of evidence known to the law.* * * *

"The rule is general, and so well founded in reason and justice, *that the high character of a particular witness cannot be permitted to form an exception to its general application."* (Italics ours.)

The Supreme Court of the United States in Lea y. Polk County Copper Company et al., 21 How. 493, 16 L.Ed. 203, had before it a case in which there was offered to offset the legal effect of a plea of prescription based upon continued, actual possession of real estate, the testimony of *two witnesses,* who swore that the occupant during his lifetime admitted ownership in another, and that he had possession for that other.

Beginning on page 500 of 21 How., on page 206 of 16 L.Ed., the organ of the Court said:

"To overcome the evidence of continued possession on the part of Davis, *two witnesses* were produced by the complainant, to wit: Crawford Broswell and Jesse Shubird. The former swears that he resided in Ducktown from June, 1845, to October 1850; that he knew John Davis, and the place Wallace improved. 'I at one time (says he) proposed purchasing that eighty acres where the Wallace improvement was. *Davis told me that he had* [*been*] *only the occupant of Luther Wallace; that he did not own the land, and that he had moved the improvements off to another place; and, having asked him who owned the land, he stated it was entered by a man by the name of Lea.* He stated he had moved off the house and fruit trees, and I think he also named the time.' Says he thinks the con-

versation took place in July, 1848. In answer to another question, the witness says: 'Mr. Davis showed me where he had moved the house from, and I understood he had moved all the improvements off that place, and the stock was running on the land that had been enclosed, and, if any of the fencing was left, I did not notice it. The place was grown up very much with bushes. There might have been some rotten rails scattered where the fence was put, lying amoung the bushes and saplings.'

"This is represented, also, as having taken place in July, 1848; and the witness swears that, in the succeeding August, Davis showed him where the Wallace house had stood.

         *     *     *   ·*     *     *

*"In 1856, when these depositions were taken, John Davis was dead, and courts of justice lend a very unwilling ear to statements of what dead men had said."*

In this case, Mitchell is dead, and a like rule should apply, as Foscue and Reynolds were the only witnesses present when these *verbal* acknowledgments are *said* to have been made, and there is no other witness to contradict them.

Besides, the alleged verbal acknowledgments of W. H. Mitchell, Sr., deceased, are wholly insufficient to show *any clear* or *specific intent* on the part of W. H. Mitchell, the dead man, to interrupt the accruing prescription of 30 years in this case. As such acknowledgments are stated by these two witnesses to have been made, after 29 years of the prescriptive period had already accrued, *the strongest kind of legal presumption* existed in favor of W. H. Mitchell, de-

ceased, that he possessed the land *as owner*, and not by *mere sufferance or permission* of Foscue.

(7) At the date of the death of W. H. Mitchell, Sr., in the year 1935, he left a surviving widow in community, Minnie A. Mitchell, and the following children and sole heirs: Jessie Mitchell, minor, represented herein by Minnie A. Mitchell, her mother and Tutrix; Vassar M. Holt; W. H. Mitchell, Jr.; Charles F. Mitchell; Jack Mitchell; Harold G. Mitchell; Hattie M. Jordons; Wavie M. Kennedy, and Sam Mitchell, all of whom are made defendants in this suit.

In August 1936, a mineral lease on the 7.35 acres in dispute, was executed by defendants, except Sam Mitchell, to C. P. McCrary and A. Holiby, who, in the same month, executed an assignment of the lease to R. L. Bauman and McAlester Fuel Company, all of whom are also made defendants in this suit.

Sam Mitchell did not sign the lease, as he had sold his interest to his mother, Minnie A. Mitchell.

All of these defendants, except Sam Mitchell, have pleaded the prescription of Thirty Years acquirendi causa under Article 3499 of the Revised Civil Code, in a joint answer filed by these defendants.

In the original opinion and decree handed down in this case, the claim of title by the defendants, the widow and heirs of W. H. Mitchell, Sr., deceased, to the 7.35 acres in dispute, was rejected, the plea of prescription of Thirty Years acquirendi causa, tendered by all of the defendants in the case,

having been overruled, and judgment was rendered in favor of plaintiffs.

 In our opinion, this judgment is erroneous, as the plea of prescription should have been maintained.

For the reasons assigned, it is ordered, adjudged and decreed that our decree herein rendered on original hearing be, and the same is, hereby annulled and set aside.

It is now ordered, adjudged and decreed that the plea of prescription of Thirty Years acquirendi causa, tendered herein by all of the defendants in the suit, be and the same is hereby maintained.

And, accordingly, it is further ordered, adjudged and decreed that there be judgment in favor of Minnie A. Mitchell, individually, as surviving widow in community of W. H. Mitchell, Sr., deceased; in favor of Jessie Mitchell, minor, herein represented by Minnie A. Mitchell, Natural Tutrix; and in favor of Vassar M. Holt; W. H. Mitchell, Jr.; Charles F. Mitchell; Jack Mitchell; Harold G. Mitchell; Hattie M. Jordans and Wavie M. Kennedy, the children and sole heirs of W. H. Mitchell, Sr., deceased, vesting a good and valid title in them to said Seven and 35/100 acres in dispute herein, under the prescription of Thirty Years, acquirendi causa, under Article 3499 of the Revised Civil Code, in excess of the lands embraced in the patent of date December 2nd, 1903, granted to W. H. Mitchell, Sr., by the United States Government, containing 112.36 acres; and vesting a good and valid title in R. L. Bauman and McAlester Fuel Company, defendants herein, by assignment recorded August 13, 1936, in Conveyance Records of Caddo Parish, Lou-

isiana, of a certain mineral lease on said Seven and 35/100 acres, acquired by the assignors, C. P. McCrary and A. Holiby, from Minnie W. Mitchell, surviving widow in community, and the heirs of W. H. Mitchell, Sr., deceased, and recorded August 12th, 1936, in the Conveyance Records of Caddo Parish, Louisiana.

It is further ordered that plaintiffs pay all costs of this court and of the lower court.

Right of plaintiffs to apply for rehearing reserved.

ROGERS, J., dissents.