HERGET, Judge.
This is a concursus proceeding instituted by Esso Standard Oil Company against various alleged property owner Defendants and mineral owner Defendants to determine the ownership of funds deposited in the Registry of the Court resulting from the production of oil. For written reasons assigned by the Trial Court on the 9 day of February, 1959 judgment was rendered, read and signed on the 20 day of March, 1959 recognizing the property owners to be the owners of the funds so deposited and rejecting the demands of the mineral owners thereto. From this judgment the mineral owners appealed to the Supreme Court of Louisiana and the case was transferred by that Court to this Court for hearing and decision under the provisions of Article 7, Sections 10 and 29 of the Constitution of Louisiana, LSA.
In his written reasons the learned Trial Judge very studiously, meticulously and thoroughly reviewed the issues and facts involved, which we quote in full:
“Reasons for Judgment
“The conflict in the claims of ownership of the funds in the Registry of the Court in these concursus proceedings arises because the claimants are in disagreement on the question of whether, or not, a tract of land in Section 2 is contiguous to Section 36 in Township 13 South, Range 9 East, lying in the Parish of St. Mary. One group of claimants is composed of the title owners of mineral rights purchased in both sections by David M. Picton, Jr., on December 8, 1935. Minerals were produced in Section 36* before the expiration of ten years from the sale, but is was more than ten years before minerals were produced from the lands in Section 2. If the tracts are contiguous, they form one body of land, and production of oil from any part of it preserves the mineral servitude over the entire body. If the tracts are not contiguous, they constitute two bodies. Admittedly, the nonproduction of minerals, oil in this case, during the ten years following the sale on one of the tracts, if they are not contiguous, caused the mineral servitude affecting it to prescribe under the provisions of [LSA] Revised Civil Code Article 789.
“The other group of claimants is Dolph Parro, the owner of the land, and his family. They own all the minerals in the tract in Section 2 if the other claimants’ rights have prescribed.
“The Esso Standard Oil Company instituted the proceedings because it is the purchaser of the oil.
“If the tracts of land are contiguous, it is because the north boundary of the tract in Section 2 bounds Section 36. If a fence is taken as the boundary, they are contiguous. If the edge of a borrow pit is taken as the boundary, the tracts are not contiguous. The fence is approximately fifty feet north of the edge of the borrow pit. The tracts are therefore contiguous, or not contiguous, by only a few feet.
“It is the contention of those who claim through the Picton sale that the fence is the line. The Parros claim that the south edge of the borrow pit is the line.
*433 “The main reason the mineral owners claim the fence is the line is because the fence is symbolic of the extent of Mr. Parro’s occupancy. They point out that the true boundary of this land has never been judicially established, so it must be determined by occupancy, or possession. There is no other way. They employed Mr. Fred M. Shutts, a civil engineer, to survey the boundary and lay it out on a plat showing its relationship to Section 36. Mr. Shutts concluded that the fence lies 34.5 feet northerly from the southwest corner of Section 36, thereby making the two tracts contiguous by 34.5 feet. He did not show the borrow pit on his plat. Mr. Shutts admitted that he was employed only to show the limits of occupancy along the line and the fence is the only evidence of those limits that he found. He did, however, contribute more than that to the claim of his clients. He also showed the position of a line projecting the straight piece of fence at the bayou to the rear.
“That line, he claims, would result in the two tracts being contiguous by 20 feet. The reason he extended this line is to disprove Mr. Parro’s contention that the straight piece of fence is on the line at the western end of the tract and the south edge of the borrow pit is on the line at the eastern end, the terminus in controversy. Admittedly, the boundary is a straight line and, according to his findings, it would not be straight, as Mr. Parro contends.
“Mr. Shutts also pointed out that his conclusions are corroborated by two former surveys of the area. One was made by W. W. Johnson and Son, in the year 1891, shown by the Exhibit M-31, and the other by Mr. Walter Y. Kemper in 1938, shown by Exhibit M-34.
"He also disagreed with the findings of the two civil engineers employed by the Parros, Mr. Val E. Smith and Mr. Theo W. Kramer.
“The surveyors disagreed over the accuracy of the older surveys and the scale employed in the preparation of the plats following them. They likewise disagreed on the significance of certain iron stakes found in the area and the system of determining the true compass readings to project their lines.
“Mr. C. Howard Fenstermaker, Jr. was employed to locate the fence with reference to a straight line drawn from the stake at the bayou, on the west, to a 2j/£ inch pipe at the east end of the fence. He shows the fence to vary from 10 feet on one side of the line to 13 feet on the other side. Mr. Fenstermaker did not make an independent survey. He plotted his information from Mr. Shutts’ plat.
“One thing they all agreed on, however, is that the fence bounds Section 36, thereby making the tracts contiguous, and the south edge of the borrow pit does not, thereby making the tracts not contiguous. That is all we need to know to render a decision'in this matter. These are the only two places at which the conflicting claimants respectively contend the limit of possession lies.
“Mr. Smith finds that the south edge of the borrow pit is 20.3 feet away from the corner of Section 36, making the tracts non-contiguous by that distance. Mr. Kramer finds that distance to be 31.9 feet.
“The situation would of course be different if we were called upon to establish the true boundary of the tract. In that case the adjoining property owner would be a necessary party, and, in addition to the question of the extent of the titles, the location of acknowledged landmarks over the periods of prescription, and other questions, could well be involved in the issue, and affect the placement of the boundary.
“But here, short of a true boundary, the best that can be done is to determine the line that the adjoining property owners recognize as their boundary. We have sufficient evidence to do that.
“The tract of land with which we are concerned in Section 2 was carved out of a larger tract in such a manner that the line *434 separating it from the balance of the section, which is the line in controversy, was to lie at a place that would enclose an area of 600 acres with the other given boundaries.
“Its corrected description is as follows:
“ ‘That certain tract or parcel of land or sugar plantation, lying and being situated on the East side of the Bayou Teche, in the Parish of St. Mary, Louisiana, having a front of eight (8) arpents, by a depth of forty (40) ar-pents, the side lines opening so as to give a superficial area of about 600 acres; which said tract is bounded above by lands belonging to Harry L. Laws formerly Walter A. O’Neill, and below by lands belonging to Mrs. Edward Sillan, now Jacquot, and being situated in Section 2, Township 13, South Range 9 East, and Section 37, Township 14, South Range 9 East.’
“Mr. Parro acquired the property on November 8, 1919 at Conveyance Book 3-W, folio 43. Its description was set out in greater detail on December 2, 1922 at Conveyance Book 4 — D, page 44.
“Because there are more or less fixed points at Bayou Teche, on the west, the lands of Mrs. Edward Sillan, now Jacquot, on the south, and the depth of forty arpents from the bayou on the east, these boundaries are not flexible. It is only the boundary involved here, the north boundary, that is flexible. According to the deed it must begin at Bayou Teche eight arpents northerly from the south boundary and as it runs east it must open so as to give the tract a superficial area of 600 acres. Obviously, it can follow no natural landmarks. It must be an invisible and arbitrary line on the ground. The only way to establish it is by survey and computation.
“Although there is no evidence that this line was ever judicially established, it is quite evident that it was laid out on the ground and artificial monuments employed to mark it. There is a stake at Bayou Teche, a fence in its western portion and a levee and borrow pit in its eastern part that no one knows when they were placed there. Mr. Dolph Parro, who is 84 years old, and Mr. Eugene Falgout, who is 79 years of age, say that these objects were there when they first became acquainted with the property. These were always regarded as the separation between Mr. Par-ro’s lands and Linwood Plantation to the north.
“Mr. Parro leased the property for about four years before he purchased it in 1919, and he says that ever since that time there has been no question between him and the owners of Linwood Plantation that the fence in the west and the south edge of the borrow pit in the east marked the division between their properties.
“When he first came there, Mr. Parro says that there was no fence between them except between the bayou and the public road. About in 1922 he continued the fence east of the road for a distance that made it about 2500 feet long, in a straight line, and on what he considered the boundary line. Apparently that was to the point that Mr. Shutts shows on his plat as station 26 + 51, 2,651 feet from the bayou. Later, he extended the fence all the way to the back, but not in a straight line, nor on the boundary line. The reason, he says, he did not attempt to follow the boundary is because there were ditches and the levee along the way and trees had grown up along them that could be used as fence posts. He tacked his fence on any tree that was convenient. He did not do so, however, without first obtaining the consent of Mr. Walter O’Neill, the manager of Linwood Plantation which was then owned by Laws Realty Company. Mr. O’Neill is deceased.
“Of course, the fence is not in a straight line. Mr. Shutts shows it 38 feet south of a varying line at station 26 + 75 ; 54.2 feet at station 54 + 39; 22.8 feet north of the line at station 54 + 76 to 14.5 feet at its eastern extremity. Mr. Shutts made his measurements at intervals of 200 feet, from *435 an offset line. It is possible that the course of the fence varies even more than he shows.
“But however this may be, there is no other reason to accept the new fence as. the division between the two properties other than that it is there. If it were intended to mark the boundary, it certainly does not reflect the straight boundary called for in the deeds. If we had no other evidence on the subject we might be compelled to accept the fence as the division line however unexplainable its crooked course may be instead of the true course we know it is supposed to run.
“But we do have evidence to explain why it is there and why it is not straight, and that it is not intended to mark the accepted boundary.
“We cannot, therefore, accept the fence as the recognized northern boundary line of the Parro tract in Section 2.
“Mr. Parro’s contention that the south edge of the borrow pit has always been recognized by him and the owners of Linwood Plantation as the separation mark between their properties is corroborated in at least three particulars. The first is the location of the levee and the borrow pit. A drainage levee, as this one apparently is, is usually placed along a property line. Not only that but it is placed on the side of the line of the owner who builds it. Mr. Parro and Mr. Falgout say that the owners of Linwood Plantation built the levee. It is logical to assume that the builders would take the dirt entirely on their side to build it. The outer edge of the borrow pit would therefore be the place that the builders of the levee considered the line was.
“The second particular is the fact that many rusty embedded iron pipes, or stakes, were unearthed on the edge of the borrow pit when Mr. Parro’s son, Alex Parro, {Sewed there. The significance of this is that when the tract was carved out, presumably that is where the line was placed. And, when the levee was built, it was used as a guide.
“The third particular is the incident related by Mr. Eugene Falgout. Mr. Falgout was overseer on Linwood Plantation until 1928, and manager until 1955. At one time they had installed a pump in the area in controversy and the water coming out of it was washing away some dirt. He believed that the water was falling on Mr. Parro’s property, so he spoke to Mr. O’Neill about it and was told that this area belonged to Linwood Plantation, and that he would find a 4-inch pipe 30 to 35 feet south of it that marked the boundary. He found the pipe. He went there with Mr. Parro and they both saw the pipe. Mr. Parro told him that he did not own any property north of the edge of the borrow pit, or the pipe. That was 30 to 35 years ago.
“Ordinarily what Mr. Falgout testified that Mr. O’Neill and Mr. Parro told him would be objectionable evidence. What Mr. O’Neill said would be hearsay testimony and what Mr. Farro said would be a self-serving declaration. Such testimony can hardly be employed, by itself, to establish a controverted fact. But here it is useful in assessing Mr. Parro’s motives. This is particularly so since the mineral claimants point out that they are at Mr. Parro’s mercy. They take the position that Mr. Parro should not be permitted to claim that anything but the fence is the line. The fence was the only evident symbol of the limits of his ownership when the mineral owners acquired their rights and Mr. Parro is therefore bound by those limits. They speculate on the extent of fraud that can result when Mr. Parro is permitted to take the position he does; that is, to point out a line other than the one that is clearly evident as the limit of his ownership. The claimants are correct that they should not be made to lose through the perpetration of a fraud against them. But at the same time the possibility of fraud, which exists in most transactions, cannot be employed to suppress a fact. If it is a fact that Mr. Parro always claimed that his ownership extends *436 only to the edge of the borrow pit, and not to the fence, the suppression of evidence of this fact removes from the record the facts necessary to determine where the commonly accepted boundary lies, and forces us to recognize a line that only the mineral claimants, whose interest is only incidental, recognize. Certainly, that would not force the adjoining owners to recognize this line. The resulting situation would be that, as between Mr. Parro and the owners of Linwood Plantation, the edge of the borrow pit would he the line. And, as between him and the mineral owners, the fence would be the line. Not only that, but such a finding would result in recognizing that the mineral owners have mineral rights in property that Mr. Parro does not claim, but that the owners of Linwood Plantation probably claim. Such a finding would be an absurdity and not in keeping with the facts.
“It is quite evident that Mr. Parro is not attempting to perpetrate a fraud on the mineral owners.
“There is no evidence that Mr. Parro ever represented to these owners that the fence was his line, or that they made their purchases based on that assumption. That could hardly he the case because the position of the line did not become significant until oil was discovered in Section 2. And even then, a survey is required to determine that the location of the fence is signifiant to the question of contiguity of the tracts. By observing the area one cannot see that if the fence is taken as the line the tracts are contiguous and if the edge of the borrow pit is employed, the tracts are not contiguous. There are no evident landmarks to indicate that. Therefore, Mr. Parro’s position does not infringe upon any representation that he made, nor upon any course that the mineral owners may have been led to pursue by reason of the fence being where it is.
“We are therefore bound to conclude that the boundary recognized by the adjoining owners must control in this case. It must control until the ideal boundary is judicially established.
“Mr. Shutts and the mineral owners lay stress on the fact that their contention is supported by the Johnson and Kemper plats. These plats apparently show the tracts mentioned to be contiguous.
“This showing, however, must yield to positive evidence to the contrary. Not only that, but this finding loses much of its force when it is considered that we have no information as to what they used as the line.
“We do not know if the levee was there in 1891 when the Johnson survey was made, nor how the conclusion was reached that the course of the line was North 87 degrees east.
“We do know, however, that the levee and the fence were there in 1938 when Mr. Kemper made his survey. If either of these surveyors used the levee as the line, it is obvious that they would show the tracts to be contiguous. If they had had the information that we now have, that Mr. Parro, and probably the owners of Linwood Plantation, recognize the south edge of the borrow pit as the line they would have necessarily shown the tracts to be non-contiguous.
“These plats, therefore, do not assist us in determining what boundary the abutting property owners recognize.
“The plats would be of material assistance if we were attempting to establish a judicial boundary that had become obliterated, if the plats had been made subsequent to the judicial establishment of the boundary. In that case, it could be safely assumed that the line shown on the plats was the true boundary.
“But this is not the case here. Not only that, but we are favored with the findings of several competent civil engineers who went into the area for the specific purpose of gathering information relating to the boundary. Their findings are specific and in detail. Johnson and Kemper had another *437 purpose. They were surveying a larger area and the showing of the line in controversy was only incidental to their work. If there is any discrepancy between the findings of Johnson and Kemper, and the surveyors who testified in this case, the findings ■of Johnson and Kemper must necessarily yield.
“Of course, we have no alternative but to recognize the apparently accepted boundary between Mr. Parro’s property in Section 2 and Linwood Plantation as the dividing line between the properties, for under the issues we cannot establish it at another place. And, according to this finding, the property in Section 2, not being contiguous to the lands in Section 36, we must necessarily hold that the mineral rights of the mineral claimants in Section 2 have prescribed by nonuser during the continuous period of ten years under the provisions of Article 789 of our [LSA] Revised Civil Code.
“Therefore, let there be judgment herein awarding the funds in controversy to Dolph Parro, Alexandre J. Parro, Sheldon Parro, Randolph Parro, Adolph Parro, doria May Parro Luke and Ida M. Bodin in the proportions set forth in their pleadings, and denying the claims of the other ■claimants to the said funds.
“The conflicting claimants have agreed that the fees of the experts should be fixed by the Court in its judgment. These fees are usually fixed at $100.00 per day of testimony per expert. Let the judgment provide accordingly.
“Rendered in open court at Franklin, Parish of St. Mary, State of Louisiana, on this 9th day of February, 1959.
“(Signed) S. O. Landry
“Judge, 16th Judicial District Court”
As observed by the Trial Judge this 'is not an action in boundary — Laws Realty •Company, the owner of the property adjoining Parro’s property on the north, not being a party to the litigation. It is essential to give validity to a judgment fixing a boundary that adjoining landowners on the boundary so fixed be made parties to the litigation. Hutchinson v. Robinson et al., La.App., 52 So.2d 565 and cases therein cited; Bergeron v. Babin et al., 167 La. 833, 120 So. 384.
LSA-Civil Code, Art. 852 provides:
“Whether the titles, exhibited by the parties, whose lands are to be limited, consist of primitive concessions or other acts by which property may be transferred, if it be proved that the person whose title is of the latest date, or those under whom he holds, have enjoyed, in good or bad faith, uninterrupted possession during thirty years, of any quantity of land beyond that mentioned in his title, he will be permitted to retain it, and his neighbor, though he have a more ancient title, will only have a right to the excess; for if one can not prescribe against his own title, he can prescribe beyond his title or for more than it calls for, provided it be by thirty years possession.”
On the trial of the suit counsel for Defendants-Appellants (mineral owners) sought to introduce evidence of possession by Parro to the fence line for the purpose of establishing their claim that' the fence line was the northern boundary of the Parro property. Counsel for Defendants-Appellees (landowners) objected to the introduction of this evidence on the ground that Laws Realty Company not being a party to the suit, the evidence was irrelevant and immaterial. The Court reserved its ruling on the objection. Inasmuch as the prescription referred to in Article 852 (quoted supra) is applicable only in suits involving an action in boundary, this not being an action in boundary, the timely objection of counsel for Defendants-Ap-pellees should have been sustained insofar as such evidence pertains to any assertion by Defendants-Appellants of the provisions *438 of Article 852. Foscue v. Mitchell, 190 La. 758, 182 So. 740; Opdenwyer v. Brown, 155 La. 617, 99 So. 482.
Concededly the northern boundary line between Parro’s land and Laws Realty Company has never been established between the adjoining owners by convention or by any boundary suit, and if the adjoining owners were to litigate the issue in a boundary suit, the line could only be determined by possession.
LSA-Civil Code, Art. 688 provides:
“Every fence, which separates rural estates, is considered as a boundary inclosure, unless there be but one of the estates inclosed, or unless there be some title or proof to the contrary.”
The presence of the fence nor the occupation of the land by the respective adjoining landowners up to the fence does not, however, in itself, establish the fence as the boundary line. By convention adjoining landowners may fix a boundary line between their properties and erect a fence, thus establishing the line.
LSA-Civil Code, Art. 3499 providing:
“The ownership of immovables is prescribed for by thirty years without any need of title or possession in good faith.”
and LSA-Civil Code, Art. 3500 providing:
“The possession on which this prescription is founded must be continuous and uninterrupted during all the time; it must be public and unequivocal, and under the title of the owner.”
make possible the establishment of prescriptive ownership to a fence line by one of the adjoining landowners. To maintain his prescriptive rights, however, occupancy alone by the landowner to the fence line is insufficient but he must initially have occupied or possessed the land publicly and unequivocably under the title of owner and such possession must continue for a period of thirty years. Foscue v. Mitchell, supra. Though he was referring to the prescription set forth in LSA-Civil Code Art. 852, the language of Chief Justice Nicholls in the case of Williams v. Bernstein, 51 La. Ann. 115, 25 So. 411, at page 415 (So.Rep.) appropriately proclaims the necessary essentials to prescribe under the above articles wherein he said:
“ * * * The mere fact that parties owning adjoining property have cultivated lands up to a certain line, or up to a certain fence, built either by one or both, or built by one and repaired by the other, does not per se e’vidence an adverse possession up to the line or fence, or an acquiescence in or recognition of an adverse ownership. Neighbors constantly run up fences within or beyond the boundary lines, and join their fences; doing so with the knowledge and understanding that such acts are merely temporary, and done sub-sidiarily to, and with reference to, the right of both to ultimately ascertain and fix rights by an action of boundary, or through a formal, legal survey. Until this happens, the lands held by each are in the occupancy, and not in the adverse possession, of either, — certainly so in the absence of a clear and direct claim advanced of adverse ownership and possession. * * * ”
The only evidence in this record pertaining to the initial erection of the fence which Appellants (mineral owners) seek to have-determined to be the northern boundary line-of the Parro property is the testimony of Mr. Dolph Parro, his son Alex Parro and Mr. Eugene Falgout. Mr. Falgout, in 1924,. was an overseer on the Laws property. Mr. Dolph Parro related that in 1922 the fence-between the Laws property and his property was not placed there by him for the purpose-of marking the ownership boundary between' the two properties but that, in fact, he obtained the permission of the owners of the land bounding his property on the north to-place the fence where it is located at the critical eastern boundary at a point on the- *439 Laws property in order to give more shade for his, Parro’s, cattle; that he at no time claimed ownership of this property to the fence line but, on the other hand, acknowledged the ownership of the property to be in the Laws Realty Company from the initial placement of the fence — that in fact his possession or claim to fee ownership of property extended only to the south edge of a ditch where there was an iron bar and the evidence reveals that this point if it is the northern boundary of Parro’s ownership dividing the two properties does not make the two sections contiguous. Mr. Falgout related that Mr. Parro at no time claimed ownership of the land north of the south line of the borrow pit which is the point that Mr. Parro related was the northern extremities of his property; and that in fact when a drainage canal was placed on the Laws property and it was necessary to erect a levee, dirt which was removed at this point for this purpose was admitted by Mr. Parro to be the property of the Laws Realty Company and Mr. Parro recognized this property to belong to the owners of Laws Realty Company and he did not claim title to same but, on the other hand, acknowledged ownership in the property between the fence and levee as being that of Laws Realty Company. Mr. Alex Parro, the son of Mr. Dolph Parro, testified that at the date of the trial he was SS years of age; that he had worked on the place since 1925 and that since that time the only claim to ownership of the property involved herein was the claim of his father to the effect that the northern boundary line of his property was the south line of the borrow pit and that the land north of this point between that and the fence involved herein belonged to the owners of Laws Realty Company.
In order to sustain the contention of Defendants-Appellants (mineral owners) that the north boundary line of the Parro property was the fence line, it is essential that they prove prescriptive possession on the part of Parro to this line. This they have failed to do. The only evidence of the possession of Parro to the fence line in question is the evidence of non-possession on his part within the contemplation of that possession essential to give title by prescription. From the initial placement by Mr. Parro of this fence at this point, he conceded that the land on which the fence was located was the property of Laws Realty Company and he affirmatively made no claim to this land but occupied said land only by permission on the part of the Laws Realty Company whose title to same he recognized from the beginning. Inasmuch as from the beginning the possession by Parro to the fence line was not of the character of adverse owner which would initially begin the prescription, no evidence was necessary to show that there had been any interruption of this prescription for prescription never having started could neither be continued nor interrupted.
Mr. Shutts who- made a survey for Defendants-Appellants (mineral owners) showing the property to be contiguous admittedly used this fence line for the purpose of establishing the northern boundary line of the Parro property. To use the fence line as the boundary line is to beg the question for, before using the fence line as forming the northern boundary line of the Parro property, it was essential that the evidence prove that the possession of Mr. Parro to this line was for 30 years in the capacity as owner. Without such evidence the fence line is not the northern boundary line of the Parro property and consequently his survey using this fence line as a point is without validity.
Accordingly, and for these reasons, the judgment is affirmed.
Affirmed.

(* The observation that the minerals were produced in Section 36 is evidently an error because by stipulation in the record by the parties, we find:
“I.
“It is stipulated that within ten years after December, 8th. 1935, oil was discovered in paying quantities from wells drilled on Lots 3 and 4 of Section 31, Township 13 South, Range 10 East, Louisiana Meridian, by Fifteen Oil Company acting under that certain oil, gas and mineral lease granted by Dolph Parro to Roy B. Siler, dated June 24th, 1932, and that production of oil in paying quantities from said lands has continued to the present time.”
This does not affect in any way the issues involved however, inasmuch as Section 31 and 36 are contiguous.)